FOURNET, Justice.
 

 This suit was instituted by Atkinson & Co., the owner of 400 bales of cotton, to recover negotiable warehouse receipts therefor which they alleged are in the possession of defendant without legal right thereto.
 

 The defendant, Hibernia National Bank in New Orleans, in answer to plaintiff’s demand, admitted that the receipts are in its possession but averred that they are held by it in pledge to secure the payment of four drafts, aggregating the sum of $9,000, which, together with the collateral security, it had purchased from the Hibernia Bank & Trust Company, in liquidation, and, in re-convention, prayed for judgment for the amount of its claim, plus interest and attorney’s fees and for recognition and enforcement of its pledge. It also called in warranty the liquidators of the Hibernia Bank & Trust Company and the Reconstruction Finance Corporation.
 

 Both parties called in warranty filed exceptions of no cause and no right of action to defendant’s demand, which were maintained, and the suit, as to them, was dismissed. Subsequently, the case was tried on the merits, and judgment was rendered in favor of plaintiff.
 

 The defendant has appealed from the judgment dismissing its call in warranty and also from the judgment on the merits.
 

 For the purpose of brevity we shall refer to Atkinson & Co. as plaintiff; the Hibernia National Bank in New Orleans as New Bank; the Hibernia Bank & Trust Company, in liquidation, as Old Bank, and the Reconstruction Finance Corporation as Finance Corporation.
 

 Plaintiff is a commercial partnership composed of Eugene Atkinson, Clifford Atkinson, and William H. Couret, engaged in the business of dealing in cotton futures. The partnership was a customer of the Old Bank for -a number of years prior to the time it went into liquidation on May 20, 1933, and in order to obtain loans to carry on its business, it entered into an acceptance agreement oh November 11, 1919, whereby it was agreed that all drafts accepted by the bank were for the account of the plaintiff and that plaintiff should deposit in advance sufficient funds in cash to meet the maturities of the drafts. Plaintiff also agreed to deposit additional collateral whenever the bank deemed the margin of collateral held by it to be insufficient to protect the bank’s acceptances for plaintiff’s account, and in order to further protect the bank, gave it an irrevocable power of attorney to transfer any property held in pledge by it which “the said bank may hold as collateral for its protection against the said acceptances
 
 or otherwise.”
 
 (Italics ours.) Such sales could be made if the bank deemed it advisa
 
 *1079
 
 ble, at either public or private sale, “without recourse to judicial proceedings, or demand, appraisement, advertisement, notice or putting in default all of which are hereby expressly waived.” The contract also provided that the plaintiff should pay 10 per cent attorneys’ fees upon all amounts due the bank by them “on outstanding acceptances by the bank for account of the undersigned [Plaintiff], or otherwise, in case it should be necessary to employ an attorney to protect any of the Bank’s rights hereunder.”
 

 Additional stipulations in the contract authorized and empowered the bank, “at any time, to appropriate and apply to the payment and extinguishment of any of the said acceptances
 
 or any of the obligations or liabilities direct or contingent,
 
 of any of the Undersigned [Plaintiff] to the Bank, whether now existing or hereafter contracted, and whether then due or not due, up to the amount of One Million Dollars ($1,000,-000), any and all moneys, stocks, bonds or other property of any kind, whether now or hereafter in the hands of the Bank, on deposit or otherwise, to the credit of or belonging to the undersigned, or any of them, including any moneys or other properties in transit to or from the Bank for any purpose; * * * ” and' that
 
 "the bank may transfer any acceptance and may deliver any or all of the collateral held by it therefor, to the transferee or transferees, who shall thereupon be vested with all the powers and rights above given to the bank in respect thereto.
 
 * * *” (Italics and brackets ours.)
 
 '
 

 Following the execution of the acceptance agreement, the parties established a custom whereby plaintiff, from time to time, borrowed money from the bank and, as evidence thereof gave its acceptance draft to its own order, payable at sight, after some designated number of days, which draft plaintiff then indorsed in blank and delivered to the bank. Plaintiff received payment of the total amount, less such sum as represented interest until the maturity of the draft. The bank would hold the draft unaccepted, or accept and sell it as said bank saw fit. Under such custom and practice, the bank never informed plaintiff whether the drafts, executed by it, had been accepted or negotiated by it, or whether the drafts were being held by the bank without acceptance, and according to the agreement and
 
 custom, without
 
 inquiry, plaintiff paid
 
 the
 
 amount due on such drafts to the bank, at which time they were returned to plaintiff and showed on their face whether or not they had been accepted and negotiated.
 

 .At the time the Old Bank went on a restricted basis on the 3d of March, 1933, it held six such drafts, to-wit: (1) For the sum of $15,776.26, dated February 28, 1.933, payable at sight thirty days after date, which was paid voluntarily on March 23, 1933, by plaintiff according to its contract an'd custom; (2) for the sum of $3,000, dated February 1, 1933, which is now in the possession of and held by the Finance Corporation; (3) for the sum of $1,500, dated February 13, 1933; (4) for the sum of $1,500, dated February 14, 1933; (5) for the sum-of $3,000, dated February 27, 1933; and (6) for the sum of $3,000, dated March 1, 1933. Each of the last four drafts were payable at sight sixty days after date and were sold, transferred, and assigned to the New -Bank on the 20th of May, 1933. Contem-,
 
 *1081
 
 poraneous with the sale the Old Bank delivered and surrendered to the New Bank the four drafts, together with the instruments of pledge and the collateral security, including’the warehouse receipts covering the 400 bales of cotton, and also the acceptance agreement of November 11, 1919. In consideration of the transfer, the New Bank paid the liquidators of the Old Bank the full face amount of the drafts, plus accrued interest thereon.
 

 From the brief filed by counsel for plaintiff, it appears that plaintiff rests its case solely upon the contention that the warehouse receipts were pledged to secure the Old Bank for the acceptance of plaintiff’s drafts^ and that since the bank did not accept the four drafts, plaintiff was under no obligation thereon and consequently, when the New Bank purchased the unaccepted drafts it did not acquire any obligations of plaintiff. The trial judge adopted plaintiff’s views as his reason for judgment in favor of plaintiff and the dismissal of defendant’s recbnventional demand.
 

 We are of the opinion that the trial judge erred in his conclusion, for the reason that the Old Bank held these drafts from the time they were executed by plaintiff until the Old Bank went into liquidation on May 20, 1933, and failed to accept or return them, which amounted to the acceptance thereof. Section 137 of Act No. 64 of 1904; First Nat. Bank of Winnfield v. Citizens’ Bank of Campti, 163 La. 919, 113 So. 147.
 

 Furthermore, we find that, in addition to the contents of the acceptance agreement and the custom that arose thereafter between plaintiff and the Old Bank, each of the pledge agreements contained a stipulation 'that the warehouse receipts were delivered by plaintiff to the Old Bank in order to secure the bank upon the acceptance of the draft referred to and all other drafts accepted by the bank for the account of the drawer,
 
 "as well as to secure the payment of any other obligation or liability, direct or contingent, of any of the undersigned
 
 [.Plaintiff]
 
 to said bank, whether due or to become due, and whether now existing or hereafter arising, with interest, attorney’s fees, expenses and costs, up to the amount of One Million Dollars ($1,000,000).
 
 * * * ” (Italics and brackets ours.)
 

 Thus it may be seen by this stipulation that the warehouse receipts were not only delivered for the security of the bank’s acceptance of plaintiff’s drafts,
 
 but also for any other obligation or liability which Plaintiff ozved the bank.
 
 In the agreed stipulation of facts it is admitted that plaintiff received $9,000 from the Old Bank at the time it delivered and executed the drafts to the bank, and it is admitted that plaintiff owed that sum to the Old Bank, unless the indebtedness is . compensated by amounts which the bank owes to plaintiff. It necessarily follows that the Old Bank, or its liquidators, had the right to sell, transfer, deliver, and assign said indebtedness represented by the drafts, to the New Bank and to deliver the warehouse receipts as security therefor. Moreover, this is specially authorized by the acceptance agreement of November 11, 1919.
 

 On May 20, 1933, the State Bank Commissioner and the liquidators of the Old Bank,
 
 *1083
 
 under an order of court, and pursuant to the contract referred to as Document 21, did transfer and assign to the New Bank plaintiff’s indebtedness to the Old Bank of $9,000, and simultaneously therewith they delivered the four drafts referred to, together with the warehouse receipts and the acceptance agreement.
 

 A mere reading of the pertinent part of the transfer agreement- conclusively shows that the transfer was completed. It reads as follows:
 

 “The Commissioner hereby assigns, transfers, sets over and delivers to the National Bank, which hereby acknowledges receipt thereof, the following: * * * (b) promissory notes, bonds,
 
 and other instruments for the payment of money, together with collateral security,
 
 if any, all as shown on list marked Exhibit A attached hereto and made part hereof.” (Italics ours.)
 

 Moreover, the Old Bank, through its liquidators, in the agreed stipulation of facts in the record, acknowledged that under Document 21 they intended to transfer and assign to the New Bank all their right, title, and interest in and to the indebtedness owned by plaintiff on the four drafts, including the collateral security and the supporting documents.
 

 Having reached the conclusion that plaintiff is liable to the New Bank (defendant) for the payment of the four drafts, the next question for our consideration is whether or not the plaintiff is entitled to compensation or offset for the items listed in the agreed stipulation of facts at the time the Old Bank went on a restricted basis, March 3, 1933. After the Old Bank deducted 5 per cent, of the balances due its customers, the remaining balances in the following accounts were:
 

 “Atkinson & Company, checking account, $ 608.85
 

 Cotton Margin Certificates of Deposit purchased by Atkinson & Company, payable to New Orleans Cotton Exchange Clearing Association, Inc. or on their order to Atkinson & Company on return of the certificates of deposit properly endorsed, 15,200.00
 

 Cottonseed Oil Margin Certificates of deposit purchased by Atkinson & Company, payable to New Orleans Cotton Exchange Clearing Association, Inc. or on their order to Atkinson & Company on return of the certificates of deposit properly endorsed, 4,750.00
 

 Clifford Atkinson, checking and savings account, 3,582.13'"
 

 On May 20, 1933, the liquidators of the Old Bank paid a dividend of 43 per cent, of the above amounts, thereby leaving unpaid and frozen the following balances:
 

 “Atkinson & Company, checking account ? 346.70
 

 Cotton margin certificates above described, 8,664.00
 

 Cottonseed oil margin certificates above described, 2,707.50
 

 Clifford Atkinson, checking and savings account, 2,041.82’"
 

 It is conceded that under the decree in the case of Intervention of Wainer (In re Canal Bank & Trust Co.), 178 La. 961, 152 So. 578, plaintiff had the right to offset the amount which was on deposit in the Old Bank to the credit of plaintiff’s checking account, i. e., $608.35, less the 43 per cent, dividend of $261.59, or the sum of $346.76. But defendant denies that plaintiff has the right to offset the money in the personal checking and savings account of the partner, Clifford Atkinson, against a partnership indebtedness, and further contends that the plaintiff should not be permitted to offset the cot
 
 *1085
 
 ton and cottonseed oil margin certificates of deposit.
 

 Under our law a partnership is an entity, separate and distinct from the individual partners, and under the authority of the case of Galloway v. Vivian State Bank, 168 La. 691, 123 So. 126, 65 A.L.R. 1308, a debt due by a partnership cannot be compensated by a credit of an individual partner. See, also, Michie on Banks and Banking, vol. 5, p. 301.
 

 In the instant case the individual partner, Clifford Atkinson, did not indorse the drafts and he did not sign any agreement authorizing the payment of the partnership debts. We therefore conclude that his individual checking and savings account cannot be used in compensation of or to offset the indebtedness due by the partnership to the bank.
 

 The cotton and cottonseed oil margin certificates of deposit show on their face that they are “payable to New Orleans Cotton Exchange Clearing Association, Inc.,” or on their order to plaintiff on return of the certificates properly endorsed. Consequently, the New Orleans Cotton Exchange Clearing Association, Inc., at any time, could have deposited the cotton margin certificates in any of its accounts in any bank, and the Old Bank would have been without knowledge of such a deposit until the certificates were presented for payment.
 

 The agreed stipulation of facts shows that the certificates were never presented or returned to the Old Bank by the plaintiff, properly indorsed by the New Orleans Cotton Exchange Clearing Association, Inc., until after the bank went into liquidation. The amount of the margin certificates of deposit in the Old Bank, representing such certificates, necessarily remained payable to the New. Orleans Cotton Exchange Clearing Association, Inc., and under the terms of the certificates themselves, clearly printed in large type on the face thereof, they had to be presented to the bank with the indorsement of the New Orleans Cotton Exchange Clearing Association, Inc., before plaintiff could be recognized as the transferee and owner thereof. This it did after the Old Bank had been placed in liquidation, and therefore the rights of the depositors had already become fixed and necessarily, for the purpose of the liquidation of the bank, the cotton margin certificates must be treated as the indebtedness of the Old Bank to the New Orleans Cotton Exchange Clearing Association, Inc. To hold otherwise would authorize debtors of the bank to purchase outstanding obligations of the bank for an insignificant consideration to offset obligations to the bank at their face value, which would be unfair and inequitable to the creditors of the bank.
 

 Suppose the situation had been reversed and plaintiff had become insolvent instead of the bank, would-any one doubt that the bank would not have been permitted to use the margin certificates, payable to the New Orleans Cotton Exchange Clearing Association, Inc., as an offset against plaintiff’s obligations ?
 

 The judgment of the district court, maintaining the exception of no cause and no right of action to defendant’s call in warranty and dismissing its case as to defendant’s call in warranty, is correct. Under the terms and conditions set forth in the
 
 *1087
 
 warranty agreement, the New Bank was relegated to a limited remedy and recourse, and having failed to comply therewith, it has no recourse against the warrantors.
 

 For the reasons assigned, the, judgment of the district court, maintaining the exceptions of no right and no cause of action filed by J. S. Brock, State Bank Examiner, through R. N. Sims, his special agent, and J. Edward McGuire, liquidator, of the Hibernia Bank & Trust Company in liquidation, and the Reconstruction Finance Corporation to the call in warranty, and dismissing the suit as to said defendants in -warranty, is hereby affirmed; the judgment of-the district court in favor of plaintiff, Atkinson & Co., and against defendant, Hibernia National Bank in New Orleans, is hereby annulled and set aside, and it is now ordered, adjudged, and decreed that there be judgment in favor of the Hibernia National Bank in New Orleans on its reconventional demand and against Atkinson & Co. in the sum of $9,000, with interest at the rate of 5 per cent, per annum on $1,500 from April 14, 1933, until paid, on the sum of $1,500 from April 17, 1933, until paid, on $3,000 from April 28, 1933, until paid, and on $3,000 from May 1, 1933, until paid, together with 10 per cent, attorneys’ fees on the total amount of principal and interest less the sum of $346.76.
 

 It is further ordered, adjudged, and decreed that plaintiff’s demand for the return of the warehouse receipts numbered 59, 3728, 53, 55, 60, 3143,-56, 3731, 3170, 23, 3168, 51, 430, 3727, 3719, 3720,-3721, 3722, and 3729, issued by the Shipper’s Compress 6 Warehouse, Inc., of New Orleans, be.and it - is hereby rejected, and the right of defendant, Hibernia National Bank in New Orleans to the possession and custody of said warehouse receipts, as pledgee, to secure the payment of plaintiff’s indebtedness to it and the foregoing judgment, is hereby recognized and ordered enforced. Plaintiff to pay all costs of court.
 

 O’NIELL, C. J., dissents.