**BEALS v. FONTENOT, Collector of Int. Rev.**

**No. 9427.**

Circuit Court of Appeals, Fifth Circuit.

May 15, 1940.

Leon S. Cahn, of New Orleans, La., for appellant.

Rene A. Viosca, U. S. Atty., and Robert Weinstein, Asst. U. S. Atty., both of New Orleans, La.; and Lee A. Jackson, Sp. Asst. to Atty. Gen., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was for the refund of estate taxes paid on account of corporate stock.[1] The claim was that though the stock was separate property of Beals, its increase in value, $35,460, was, due to the management and efforts of Beals, the property of the community, and only one-half of it was taxable to the estate of the deceased. The defense was that admittedly separate property when they were acquired, "separate property is that which either party brings into the marriage," La. C. C. art. 2334, the character of the shares as separate was not at all affected by the increase in their value. Submitted on a stipulation,[2] the defense prevailed.

---

[1] Twenty-four shares of the 100 shares of Leidenheimer Baking Company, Ltd., a closely held corporation of which from its inception in 1908 until 1918 when Leidenheimer died, Leidenheimer had been president and Beals vice-president, and from 1918 until his death in 1934, Beals had been president and general manager. For this stock, Beals, less than a month before his marriage on November 18, 1908, to plaintiff, had paid $2,400 on October 23, 1908. At his death the stock was worth $37,860.

[2] 1. The G. H. Leidenheimer Baking Company, Ltd., hereinafter called the Bakery, was incorporated as a Louisiana corporation on July 10, 1908, with an authorized capital of $10,000, consisting of 100 shares of $100 par value each. Joseph C. Beals, plaintiff's testator, purchased 24 shares on October 23, 1908, paying for same, in cash, $2,400. George H. Leidenheimer took 51 shares at the same price per share. The remaining 25 shares were taken by stockholders who were never active in the management of the corporation. No additional capital was ever invested in the bakery other than the original $10,000. No transfers of stock were made except those occasioned by the death of a stockholder.

2. Beals was married on November 18, 1908, to plaintiff, who is his widow, and until his death on December 15, 1934, a community of acquets and gains existed between the spouses in conformity with the laws of Louisiana. The value of his bakery stock on the date of marriage was its original cost of $2,400. At the time of his death his stock was worth $37,860, an increase of $35,460.

3. From the inception of the corporation, Leidenheimer was President and Beals was Vice-President and Secretary-Treasurer. Leidenheimer and Beals devoted their entire time to the bakery. Generally, Leidenheimer supervised the production or baking department; Beals handled the purchase of flour and all other materials, managed the sales, and handled all records and office matters. Leidenheimer was an experienced baker; Beals was experienced in the flour business, in which he had been previously engaged for a number of years. Neither Leidenheimer nor Beals, at any time after the incorporation of the bakery, engaged in any other business activity. The bakery always employed the help necessary for its proper operation.

4. Leidenheimer became seriously ill in the year 1916. For about two years, until Leidenheimer's death on November 3, 1918, Beals assumed the entire management of the business, taking over Leidenheimer's duties, as well as his own, assisted in the production department by his step-son, Bernard J. Shutten. During Leidenheimer's lifetime he and Beals always drew equal salaries, starting at about $200 per month. Each of them was receiving $6,000 per year, at the time of Leidenheimer's death. No other executive salaries were paid up until then. The value of the Beals' stock at the time of Leidenheimer's death was approximately $1,000 per share.

Placing her reliance on Article 2408, of the Revised Civil Code of Louisiana,[3] and cases giving it application to businesses conducted individually[4] and in partnership,[5] appellant is here insisting that the fiction of separate corporate entityship on which the District Judge relied to deprive the community of the result of Beals' labor for it, will not avail to do so here.

Emphasizing both the family character of the corporation and the greatly personal connection with and contribution to it of her decedent, appellant insists that it is a mere "sticking in the bark" to say that the shares were separate and remained separate, both as to the original and the increased value, when the shares here are not the substance but the symbols of the property created by the efforts of the community, and therefore they are, as to all of their value in excess of the original cost, the property of the community.

We agree with appellant that except in the case of stock in a corporation solely owned, it would be difficult to imagine a case of corporate stock ownership presenting stronger equities for the recognition of the claims of the community to its' increase in value. For there can be no doubt that Beals' services to the corporation were very valuable, while the equities of the community are further heightened and strengthened by the fact that had the marriage been expedited or the stock purchase delayed 26 days, the whole would have been community.

◼◼ We think it clear, however, that the case may not be disposed of upon these

---

5. On July 31, 1919, Beals, by unanimous vote of the stockholders, was elected President, Secretary-Treasurer and General Manager for a five year term, at the same salary of $6,000 per annum. Leidenheimer's widow was elected Vice-President at a salary of $1,800 per annum, but never performed any duties, and seldom visited the bakery. This arrangement was renewed regularly at five year intervals by unanimous vote of the stockholders, and was in force at Beals' death on December 15, 1934.

6. During Beals' presidency, from 1919 to 1934, inclusive, he exercised all executive authority. He was assisted in the production department by his step-son, Schutten, who was about 23 years old in 1919. Schutten took care of all production supervision, under Beals' direction, that Beals did not himself attend to. Schutten gradually made himself more useful. He was never, during Beals' lifetime, given any executive office, but received from time to time increases in salary, and was earning about $3,600 per annum by 1934. He succeeded to Beals' offices when Beals died.

7. During Leidenheimer's lifetime the Board of Directors consisted of Leidenheimer, Beals and Mrs. Beals. After 1918, the Board consisted of Beals, Mrs. Leidenheimer and Mrs. Beals. Dividends were declared by the Board, but it was the practice for the Board to approve payment of dividends upon Beals' recommendations. The Board of Directors always held all the stock, either directly or under powers of attorney.

8. Prior to Leidenheimer's death, a total of $25,000 had been paid in dividends to the stockholders of which $20,000 was paid out after he became incapacitated by illness. During the period of Beals' presidency a total of $425,000 was paid in dividends.

9. Upon Beals' death the capital and surplus of the corporation amounted to some $157,750, or $1,577 per share. The surplus of $147,750 consisted exclusively of undistributed profits from operations in due course of business. No capital gains or other fortuitous profits, outside of regular operations, were ever realized by the corporation. The bulk of the accumulated surplus was not necessary to the operations of the business; almost $100,000 thereof was invested in bonds when Beals died. Beals was a very conservative business man.

10. From 1916 to 1934, inclusive, Beals received as dividends from his stock approximately the sum of $108,000 which fell into the community. He also received during this same period salaries totalling approximately $108,000.

3 Article 2408 of the Louisiana Civil Code of 1870 provides that where the separate property of either spouse has been increased during marriage the other spouse shall be entitled to one-half of the increase if it be proved that the increase be the result of the common labor or industry; "but there shall be no reward due, if it be proved that the increase is due only to the ordinary course of things, to the rise in the value of property, or to the chances of trade."

4 Hellberg v. Hyland, 168 La. 493, 122 So. 593.

5 Denegre v. Denegre, 30 La.Ann. 275, and Succession of Kidd, 51 La.Ann. 1157, 26 So. 74; Atkinson & Company v. Hibernia National Bank, 186 La. 1074, 173 So. 768.

or like considerations, but only upon the consideration that decedent, having elected to preserve his investment as separate by taking and maintaining it, in the form of corporate shares, in his name, neither appellant nor the court after his death by invoking supposed equities may defeat the government's claim that that election must stand at least as to its claim for taxes. No Louisiana case in point is cited. We have found none. Kittredge v. Grau, 158 La. 154, 103 So. 723, 726, did indeed deal with corporate stock, holding it in its entire value to be separate property. The point made here, however, that the certificate continued to be separate property but the value of the increase had fallen into the community, was not made there nor was it adverted to in the opinion. It therefore, even in a common law state, would not be a precedent,[6] much less so would it be one in a Civil Law Code State. The answer to the question must therefore be sought in the code in the light of such analogies as the jurisprudence affords.

■ Appellant concedes as she must that in the usual case of corporate stock, no reward is due the community because in such cases, the increase of value is certainly due "only to the ordinary course of things, to the rise in the value of property, or to the chances of trade." She insists though, that by the stipulation in this case, it is "proved that the increase * * * is the result of the common labor, expenses or industry" within the meaning of Civil Code, Article 2408. Appellee, on its part, insists that in the case of this stock as in the case of corporate stock in general, it must be found, as the district court did, that the increase in value of the stock is due to the efforts of the corporation, the ordinary course of things, the rise in the value of the property and chances of trade and that there is no reason here to disregard the corporate fiction.

■ We agree with appellee and the District Judge. The stipulation shows that throughout "the life of the deceased, the community received from the corporation in the form of dividends and salaries, compensation for the services of deceased," and there is no basis for a finding that the increase in value of the stock which was not paid out in dividends was the result of the community labor, expenses, or industry of the community of appellant and her deceased husband within the code article. Nothing in the proof takes the case out of the general rule established by the code that property owned separately before marriage does not through the increase of value after marriage, become either as to the original or the increased value, property of the community. The community is not a partnership, nor may it be said that the community is a partner with other members of, or with, a corporation in which one member of the community owns stock in his separate right. A case illustrating the difficulties into which courts run when they depart from the simple rule that "property owned before marriage remains separate after marriage," is In re Buchanan's Estate, 89 Wash. 172, 154 P. 129, a case of corporate stock to the purchase of which both husband and wife contributed in contemplation of their marriage.

There, after reaffirming the general doctrine that the natural enhancement in value accruing while the marriage relation exists takes the character of the property enhanced because otherwise a specific piece of property would be constantly shifting from separate to community, examining the difficult and involved facts of that case, and making general observations on the result where personal activities enhance the value of stock, the court wound up with the conclusion that the funds had become so commingled and confused in the case at bar, as that, not merely the increase but the whole property had become community.

Confining our decision entirely to the question before us, whether the whole of the value of the stock or only its original cost is subject to estate taxes as the property of decedent, we think it clear that the District Judge was right in holding that

---

6 "A deliberate or solemn decision of a court or judge, made after argument on a question of law fairly arising in a case, and necessary to its determination is an authority or binding precedent, in the same court or in other courts of equal or lower rank, in subsequent cases where 'the very point' is again in controversy; but the degree of authority belonging to such a precedent depends of necessity, on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion or exigency of the doctrine is, in the last analysis, moral and intellectual, rather than arbitrary or inflexible." Chamberlayne—Stare Decisis 19.

960

the appellant had not proved that "this increase is the result of the common labor expenses or industry" of the community and having failed to so prove, her claim for refund must fail.

The judgment was right. It is affirmed. Affirmed.