HEIRS OF JOSÉ A. SANTAELLA SAURÍ, ETC. ET AL., Plaintiffs and Appellees, *v.* SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellant.

No. R-66-407. Decided June 28, 1968.

*J. B. Fernández Badillo,* Solicitor General, and *Elpidio Arcaya,* Assistant Solicitor General, for appellant. *Leopoldo Tormes García* for appellees.

MR. JUSTICE TORRES RIGUAL delivered the opinion of the Court.

For the purposes of the Inheritance Tax Act, is the increased value of corporate shares or of real property acquired by a predecessor in interest with his own capital of a separate or of a community nature?

This is essentially the question to be determined in the case at bar. The fundamental facts were stipulated by the parties, there being controversy only as to the character—whether separate or community—of the increments obtained after marriage in the value of some separate shares and of a real property. It appears from the facts stipulated that José Antonio Santaella died in Ponce on November 11, 1962. The Secretary of the Treasury determined the inheritance tax in the amount of $362,343.46. The heirs of the predecessor in interest agreed to pay only the amount of $161,178.51, the remainder of $201,164.95 being challenged before the Superior Court, Ponce Part, by way of appeal as established by Act No. 235 of May 10, 1949, 13 L.P.R.A. § 281 *et seq.*

Said remainder refers to the following items consisting of properties which the Secretary of the Treasury considers to be of a separate character; the heirs, on the contrary, consider that only the original cost of the properties is of a separate character, and that the increased value partakes of the community nature:

(1) Lot and house situated on Sol Street at the corner of Union Street in Ponce, acquired by the predecessor in interest *by way of exchange* of 3585 shares of Constancia Development Corporation, which belonged to him, as separate property. At the time of their issuance, the shares had a par value of $10 each, and when they were exchanged they had a value of $12.8736,

amounting to $46,146.74. The trial court considered that the original cost of $10 per share was of a separate character, and that the increase in value of $12.8736 per share was of a community nature. When the predecessor in interest died, the Secretary of the Treasury appraised the exchanged property at $61,600. Applying the previous proportion, the trial court concluded that $47,849.46 of that amount was separate, and $14,850 was community property.

(2) 8,170.06 shares of Playa Development Corporation acquired by the predecessor in interest on January 26, 1962, *by way of exchange* of various properties which belonged to him as separate property. The original value of issuance was $10 per share, amounting to $81,706. When the predecessor in interest died, the Secretary of the Treasury valued the shares at $562,537.50, thereby revealing an increased value of $480,831.50, which the court considered to be of a community nature.

(3) 7,900 shares of Sabarí Estate, Inc., acquired by the predecessor on the same date, January 26, 1962, *also by way of exchange* of several properties of a separate character which belonged to him. At the time of issuance, the shares had a par value of $10 each, and when the predecessor died, the Secretary of the Treasury valued them at $508,513.50, revealing an increased value of $367,013.50 which, like the former one, the Secretary of the Treasury considered to be of a separate character, and the trial court concluded that it was community property.

(4) 86.432 and .611 shares of the Constancia Development Corp., acquired by the predecessor as separate property. The original cost of said shares was $864.32 and $6.11, respectively. When the predecessor died, the Secretary of the Treasury valued them at $937.56 and $6.73, respectively.

The total of these items amounts to $1,133,595.19, of which the trial court adjudged the amount of $924,169.34 as community property.[1] As a result thereof the tax was reduced from $362,343.46 to $161,178.51.

Feeling aggrieved by that decision, the Secretary of the Treasury requested review assigning as sole error of the

---

[1] The appraisal was made by the Secretary of the Treasury and accepted by the heirs, the same, therefore, not being subject to debate.

trial court the decision that the increase in value of the predecessor's separate properties is of a community nature.

In the analysis of this question it is proper for us to consider the relevant principles which govern the conjugal system,[2] and the nature of the increased value of the shares and of the property, under the specific circumstances of this case.

The separate nature of the shares and of the property situated on Sol Street at the corner of Union Street, which were acquired by exchange of properties belonging exclusively to the predecessor, is not involved in this appeal.[3]

---

[2] Sections 1299 and 1301 of the Civil Code, 31 L.P.R.A. §§ 3631 and 3641, which provide:

Section 1299.

"The following is the separate property of the spouses:

(1) That brought to the marriage as his or her own.

(2) That acquired by either of them during the marriage by lucrative title, that is to say, by gift, legacy or descent.

(3) That acquired by right of redemption or by exchange for other property belonging to one of the spouses only.

(4) That bought with money belonging exclusively to the wife or to the husband."

Section 1301.

"To the conjugal partnership belong:

(1) Property acquired for a valuable consideration during the marriage, at the expense of the partnership property, whether the acquisition is made for the partnership or for one of the spouses only.

(2) That obtained by the industry, salaries, or work of the spouses or of either of them.

(3) The fruits, income, or interest collected or accrued during the marriage, coming from the partnership property, or from that which belongs to either one of the spouses."

[3] However, it is convenient to point out in order to clarify factual and conceptual errors, that the trial court, induced by the brief of the heirs, determined that the title of ownership of the shares did not flow from a contract of exchange but from a partnership contract which "is not expressly included among the ways of acquiring separate properties, provided by the aforecited section, subdivision 3, which only considers 'the redemption' and 'the exchange,' and although in this case in the deeds of contribution the exchange of land for shares is mentioned, these statements cannot vary the true nature of the contract which was one of partnership."

Such weighing of the facts and of the law is mistaken.

As to the facts. There was no evidence that a partnership was

We shall discuss now the nature of the increased value of said properties and the rules of law to determine its separate or community character. To frame it within subdivisions 2 and 3 of § 1301 of the Civil Code,[4] the trial court

organized. As to this matter, the only evidence presented were the deeds of exchange. The terms of said deeds leave no doubt as to the nature of the contract. It clearly appears that the executing parties bound themselves to give a thing in order to receive another, which is precisely the definition of the contract of exchange. Section 1428 of the Civil Code, 31 L.P.R.A. § 3981.

The heirs could have presented evidence, if any, to show that that was not the consideration of the contract, *Rossy* v. *Superior Court*, 80 P.R.R. 705 (1958), or to reveal which was the true transaction between the parties, *Quiñones Ramos* v. *Otero Roque*, 89 P.R.R. 371 (1963). Since there is not the slightest evidence as to this particular, the trial court was bound to construe the deeds of exchange by their own contents, stating what they textually and substantially contained, Law of Evidence, § 26, 32 L.P.R.A. § 1669; particularly in the case of a contract executed before a notary by way of a public document. The documents were entitled by the notary "Exchange Deeds," and the transaction is described thus in its different clauses. Section 16 of the Civil Code, 31 L.P.R.A. § 16, which establishes the hermeneutics rule that technical terms shall be interpreted according to their meaning in the profession, is also applicable.

As to the law. The trial court also erred in limiting subdivision 3 of § 1299 exclusively to the properties acquired by right of redemption or by exchange for other property belonging to one of the spouses only.

A fundamental principle of the conjugal system is the one which recognizes the individual capital of each spouse apart from the capital of the conjugal partnership. The original title is maintained by subrogation in the properties no matter the changes, transformations or substitutions made thereon. IX Manresa, *Comentarios al Código Civil Español* 547, 5th ed.; XXII Scaevola, *Código Civil* 156 (1905); V-1 Castán, *Derecho Civil Español, Común y Foral* 270, 8th ed.; IV Borrell y Soler, *Derecho Civil Español* 425 (1954); II-I Puig Peña, *Tratado de Derecho Civil Español* 298. Otherwise, the identity of the individual patrimony would be thwarted by the continuous transformations of the properties in the ordinary flow of the economic activities after marriage. This principle acquires more efficacy in our evergrowing industrial economy, which stimulates investment, speculation, credit secured by real property, and other business activities.

The redemption and the exchange are, hence, simple cases of substitution of one property for another, and they are not the only cases. Scaevola, *op. cit.* at 156. Manresa enumerates fifteen examples of subrogation in addition to redemption and exchange, by setting forth: "Section 1396 does not add more cases of subrogation, but there is no doubt that others exist which are included, if not in writing, in the spirit of the provision." Manresa, *op. cit.* at 450.

[4] See footnote 2.

concluded that it could be considered the result of the predecessor's industry or work, through the corporations of which he was part, or as fruits yielded which, in either case, partook of a community nature. In other words, the court attributed to the predecessor the activities of the corporation, thus piercing the corporate veil.

There is no ground in the evidence to support the conclusion that the increased value of the shares was the result of the industry and effort of the predecessor, or even of the corporations. The exchanges were executed on January 26, 1962, and the predecessor died 11 months later, on November 11, 1962. It is improbable that in such a short period of time, in the absence of any evidence to the effect, such an unusual increase[5] would be due to steps taken by the predecessor or the corporations. It seems more reasonable to infer that it was due to the fact that the value fixed on the properties for the purposes of exchange was purely arbitrary or conventional, for the only purposes of organizing the corporate bodies, or more probably, it was due to the natural flow of values generated by an economy, like our own, in a continuous growth where the multiplicity of the uses of the land is inevitably reflected in its values. See Negrón García *"Impacto del Aumento en el Costo de las Tierras en Puerto Rico,"* 32 *Rev. Jur. U.P.R.* 452 (1963); Torres Rigual, *"Control of Land Values Through Taxation,"* 23 *Rev. C. Abo. P.R.* 419 (1963), Abrams, *"Urban Land Problems and Policies,"* 7 United Nations, Housing and Town and Country Planning (1953).

---

[5] The increase was $924,169.34. The appraisal was made by the Secretary of the Treasury and accepted by the heirs of the deceased. It was made by determining the fair market value of the land and other property of the corporation at the time of the death of the predecessor and subtracting the liabilities therefrom. The quotient was divided by the number of shares issued and outstanding. The appraisal thus made reflected adequately the real value of the shares in a clear operation of readjustment of the capital stock to reality.

 In this last case the increased value should be properly considered as a natural increment or accession. Section 287 of the Civil Code, 31 L.P.R.A. § 1131, provides that the ownership of property carries with it the right, by accession, to everything which is produced thereby, or which is united thereto or incorporated therewith, either naturally or artificially. That is, the Code established the accession as a consequence of the right of property, it being considered by Manresa[6] as "the very right of property in exercise." A consequence thereof is that the increment or deterioration of the properties benefits or prejudices the respective owner, unless it is due to the effort or industry of one of the spouses or at the expense of the conjugal partnership. *Puente* v. *Pérez*, 7 P.R.R. 181 (1904); IX Manresa, *op. cit.* at 546; II-I Puig Peña, *op. cit.* at 593; 4 Borrell y Soler, *op. cit.* at 430, in which case, § 1304 provides that investments to produce improvements are credited to the conjugal partnership. Puig Brutau sets forth this rule with crystal clearness: ". . . the increase of value produced by investment or expenses remains integrated in the thing itself and there does not arise an undivided part in favor of the conjugal partnership, but the latter shall have only acquired a right of credit against the spouse owning it," IV-I, *op. cit.* at 664.

██ *A contrario sensu*, when the increased value is the mere result of the lapse of time, or of other causes other than the effort of one of the spouses or at the expense of the conjugal capital, it benefits only the respective owner. The labor of the spouse or the investment of the partnership property must be the object of proof by the person who alleges the community character of the increased value. The person cannot invoke any presumption, since the mere

---

[6] Vol. III, *op. cit.* at 166. VI Scaevola, *op. cit.* at 520 (5th ed.), expresses himself in the same sense. See II Castán, *op. cit.* at 157; IV-I Puig Brutau, *Fundamentos de Derecho Civil* 664; 50-1 Cossío, *Tratado Práctico y Crítico de Derecho Civil* 65.

increase in value does not give basis for it. "That is," as Puig Peña sets forth, "that the increased value of separate properties does not fall within the ambit of the presumption of community property established in § *1407* [1307 in ours]. It is necessary to establish thoroughly that it was due to the partnership property or industry of the spouses." Puig Peña, *op. cit.* at 293.

A similar conclusion has been reached in the jurisdictions of Idaho, Louisiana, and Texas, which follow fundamentally the basic principles of the conjugal system established in the Spanish legislation. 1 De Funiak, Principles of Community Property 81 (1943 ed.).

In *Beals* v. *Fontenot*, 111 F.2d 956, 5th Cir. (Louisiana 1940), it was held:

"The stipulation shows that throughout the life of the deceased, the community received from the corporation in the form of dividends and salaries, compensation for the services of deceased, and there is no basis for a finding that the increase in value of the stock which was not paid out in dividends was the result of the community labor, expenses, or industry of the community . . . . Confining our decision entirely to the question before us, whether the whole of the value of the stock or only its original cost is subject to estate taxes as the property of decedent, we think it clear that the District Judge was right in holding that the appellant had not proved that this increase is the result of the common labor expenses or industry of the community and having failed to so prove, her claim for refund must fail."[7]

This same doctrine was adopted in *Daigre* v. *Daigre*, 83 So.2d 900 (1955), and in *Scofield* v. *Weiss*, 131 F.2d 631, 5th Cir. (Texas 1942), in which it was set forth thus:

"It seems to be conceded, but if not, it is well settled that an original issue of corporate stock, which was separate property when issued to the husband, retains its separate character, no

---

[7] See Note on this case in XV Tul. L. Rev. 308.

matter how much it increases in value as a result of surplus accumulated out of the earnings of the corporation."

De Funiak, in discussing the question in general terms, states the following:

"Under the Spanish system, where the separate property of a spouse during the marriage increased in value for some intrinsic reason, such intrinsic increase was not shared with the other spouse . . . . But improvements to and increases of the property of either spouse, if originating from industry or labor or if due to the use of community property, pertained to the community . . . . The principle of the Spanish law of community has been largely followed in this country with respect to increases in value, during marriage, of the separate property of one of the spouses. If the increases result in the ordinary course of events and not from any labor or industry, such increases belong wholly to the owner of the separate property. It is otherwise, of course, if the spouses' labor or industry or property have contributed to the increase, for then the community should share in the increase in the proportion to which the community contributed to the increase."[8]

As we previously observed, there was no evidence that the increased value was due to the labor of one of the spouses or at the expense of the partnership property. Therefore, there is nothing to be credited to the conjugal partnership.

■ Assuming, however, that the increase in value were the result of the activities of the corporation, we cannot adjudge those activities to the predecessor.

The corporation has its own corporate existence and its own capital, separate from that of its stockholders. General Corporation Law, § 106, 14 L.P.R.A. § 1106. Its business is managed by the board of directors, except as otherwise provided by law or by the articles of incorporation. General

---

[8] This is not entirely correct, for, as we previously observed, the increase in value produced by investment or expenses of the partnership property remains integrated with the thing itself, granting to the conjugal partnership a credit against the spouse owning it. Puig Brutau, *op. cit.* at 664, Borrell y Soler, *op. cit.* at 430.

Corporation Law, § 401, 14 L.P.R.A. § 1401. It is the board as such, and not each particular director, which is responsible for the success or failure of the management of the corporation, no matter how useful and efficient the efforts of its directors or stockholders may be. They have the right, at most, to a compensation for their services, which would be considered of a community character, as wages or remuneration obtained for their labor or industry. Subsection 2, § 1301 of the Civil Code.[9] But the increase of the capital of the corporation belongs to the latter until it is distributed in dividends, under the provisions of the General Corporation Law, § 517, or until it is finally dissolved.

The fact that the corporation as a juridical entity can act only through natural persons, merely explains a reality. However, what is important and has juridical consequences is that that action of its directors, for the benefit of the corporate capital, is corporate labor and not personal labor. To claim otherwise is tantamount to piercing the corporate veil. This is only justified when the corporate existence is used to "defeat the public convenience, justify wrong, protect fraud or defend crime." *South P.R. Sugar Corp.* v. *Sugar Board*, 88 P.R.R. 42 (1963), and cases cited therein. None of these circumstances is present in the case at bar.

Therefore, even if it is assumed that the increased value of the shares was due to the corporate labor, the trial court also committed error in attributing said labor to the predecessor in interest.

■ The trial court and the heirs in their brief, invoke in their support the judgment of the Supreme Court of Spain of November 8, 1893, which decided:

"The overcharges or the premiums of bank stock brought to the marriage or the benefits obtained by them are earnings and profits obtained by the conjugal partnership to which they belong, they cannot be considered as increment or accession of

---

[9] See footnote 2.

the former shares, but they belong to the community property, as the Supreme Court has definitely decided." 74 *Jur. Civ.* 302.[10]

Neither this judgment binds us nor its reasoning persuades us. *Widow of Fornaris* v. *Amer. Surety Co. of N.Y.*, 93 P.R.R. 28, 46 (1966) ; *Jiménez y Salellas, Inc.* v. *Maryland Casualty Co.*, 92 P.R.R. 200 (1965) ; *Banchs* v. *Colón*, 89 P.R.R. 471–481 (1963) ; *Reyes* v. *Superior Court*, 84 P.R.R. 27, 29, 30 (1961) ; *People* v. *Matos*, 83 P.R.R. 323, 328 (1961).

That was a case of issuance of new shares due to the increase of the capital stock. The former stockholders were granted the advantage—premium or overcharge—of subscribing the new shares at 110 for 100 of the face value, when the value in the stock market was 300. The wife, owner of the former shares as her separate property, acquired several of the new shares with money of the partnership property.

It seems clear to us that the advantage of acquiring at 110 for 100 what was worth 300 constituted a real accession or increment of the former shares. It was a consequence inherent to the ownership of the original shares, without industry or labor of the spouses having anything to do with the increment. For that reason, it could not be considered anything else but her separate property. Of course, the payment made at 110 for 100 to acquire the new shares, being an expense of the partnership property had to be attributed to the conjugal partnership. However, the Supreme Court of Spain made no distinction and considered the increment as well as the expense of a community character. This has brought criticism from various writers.[11] Scaevola considers

---

[10] This opinion was ratified in the Judgments of May 14, 1929, May 31, 1930, and April 18, 1934.

[11] Scaevola, *op. cit.* at 157; Álvarez Álvarez, *El Aumento de Capital de las Sociedades Anónimas y la Sociedad Ganancial*—13 *Anales de la Academia Matritense* 229 (1959) ; see, also, the discussion of the subject by Puig Brutau, *op. cit.* at 644. See also, *Dictamen Núm. 14* of Clemente de

it incorrect, it being inconceivable to him "that the Supreme Court suffered such confusion." Analyzing it, he states:

"Why does the Court presuppose, without giving the reasons for its affirmance, that the profits involved cannot be considered as an increment or an accession? Are they included perhaps in paragraph 1 of § 1401 because its acquisition during the marriage was made for a valuable consideration and at the expense of the community property? Was there perhaps industry or labor on the part of the spouses or any one of them as ground for the acquisition? Is it finally that the Court admits that the increased value of the thing converted into something new is the fruits, income or interest included in number 3 of § 1401?" *Op. cit.* at p. 159.

Álvarez Álvarez considers it an excessive generalization which does not constitute jurisprudence:

"From this jurisprudence[12] one can apparently draw an immediate conclusion: the new shares acquired during marriage are community property. Said statement is, as we shall see, excessive. My personal opinion is that new shares, because they are subscribed for during marriage, do not have to be community, but that it depends not only on whether the contributions are separate or community, but also on the ownership of the former shares and on the right of subscription.

"Specifically, the conclusion which has been drawn from the jurisprudence of the Supreme Court, at times by the Court itself, is excessively simplistic because although in some case the whereases of the judgments generalize, that is not binding nor does it constitute the case law which is derived from the judgments and not from the *obiter dictum.*" *Op. cit.* at 230.

Rebutting the grounds of the doctrine laid down by the Court, Álvarez Álvarez states:

---

Diego, in I *Dictámenes Jurídicos* 167, *Editorial Bosch,* Barcelona, and *Dictamen Núm. 3* of A. Maura in VI *Dictámenes* 31, *Editorial Saturnino Calleja, S.A.* Madrid, in which it was concluded, after considering the problem extensively, that the overcharge or premium of the shares brought as separate property of the spouse has this very quality, and it is not of a community nature.

[12] He refers to the Judgment of November 8, 1893, as well as to the ones mentioned in footnote 10.

"According to this, the profits obtained by the negotiation or sale of a separate property are community property. Nobody has ever dared to defend this. If a house which was brought into the partnership and valued at 1000 is sold for 5000, those 4000 are as separate as the house itself; this has always been so, but if the thesis of the Supreme Court were accepted in a time of monetary devaluation, the injustice would know no limits, it would be simply like converting a system of a community of acquisitions at a valuable consideration into another of a general partnership." *Id.* at 233.

He concludes at page 234, that:

"The defect lies in that as a result of an insufficient study of the mercantile problem, of an absolute absence of regulations of this right in the scant rules on stock companies of the Code of Commerce, and of its completely exaggerated concept of fruits —on the belief that fruit is any benefit obtained from something and confusing the rights or powers with the fruits—it has taken the easy path of the generalizations and has created an 'apparent legal doctrine' in padded out phrases in the whereases, which did not have their consequence or their justification in the judgments and which, as a matter of fact, were not necessary in any of the cases decided." *Id.* at 234.

This is enough to reject the attempts of the trial court to incorporate into our law such a brittle doctrine. But if that were not sufficient, it is proper to indicate that subsequently, in its Judgment of January 23, 1947, the Supreme Court of Spain recanted and dismissed the generalizations of the Judgment of November 8, 1893, stating that: ". . . fruit is something produced by the thing bearing it and it is evident that the new shares cannot be considered as generated by the former shares, whose fruit or product are the dividends distributed among the stockholders or promises which may have the same character . . . the right of subscription of new shares does not have the character of fruit. . . ."[13]

---

[13] See the discussion of this Judgment of January 23, 1947, in the aforecited article of Álvarez Álvarez, at p. 235 *et seq.*

In view of the foregoing reasonings, we decide that the increased value of the real property and of the shares which belong to one of the spouses only is of a separate character.

