UNITED STATES of America, Plaintiff-Appellee,

v.

Albert Samuel FORTNA, Jr., James Lyne Harnage, George M. Sharer, and Christopher James Reo, Defendants-Appellants.

No. 85–1644.

United States Court of Appeals, Fifth Circuit.

Aug. 5, 1986.

Bruce Anton, Frank Jackson, Dallas, Tex., for Fortna.

Jerry C. Alexander, Court Appointed, Dallas, Tex., for Harnage.

Henry Gonzalez, Tampa, Fla., for Sharer.

Michael Edward Vigil, Albuquerque, N.M., for Reo.

Mervyn Hamburg, Washington, D.C., Marvin Collins, U.S. Atty., Robert R. Smith, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GOLD-BERG and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Albert Samuel Fortna, Jr., James Lyne Harnage, George M. Sharer, and Christopher James Reo appeal their convictions for various offenses concerning a conspiracy to import cocaine. Appellants raise several errors, including their claim that the government obtained evidence against them in violation of Harnage's attorney-client privilege. We affirm the convictions of appellants Fortna, Sharer, and Reo. On Harnage's appeal, we direct the district court to conduct a supplemental hearing on Harnage's motion to quash the indictment; we will dispose of Harnage's appeal once the district court has supplemented the record with the transcript of the ordered hearing and its findings.

### Facts and Proceedings Below

Harnage claims to have retained James Smith, a well-known Colorado criminal defense attorney, in the winter of 1983–1984. It is undisputed that Harnage paid Smith a $1,000 retainer fee. Smith was an attorney for Harnage's ex-girlfriend Linda Whitman, a government informant and witness in this case. When Smith was confronted by the Aurora, Colorado police department concerning his possible drug involvement, he agreed to cooperate in drug investigations. On April 26, 1984, Smith met with FBI Agent Charles Evans and furnished a list of approximately twenty persons who, according to Smith, could supply cocaine. Harnage's name was on the list. Smith also identified Whitman as a member of Harnage's cocaine operation. Smith told Evans that Harnage was not a client even though Harnage had paid the retainer fee.

After the April meeting with Evans, Smith continued to provide information about Harnage to the FBI almost daily. On September 28, 1984, Smith wore a concealed tape recorder and traveled around Denver in a vehicle with Harnage and others under FBI surveillance. Smith then supplied information to support a warrant for a search of the vehicle that evening, which produced two kilograms of cocaine. The vehicle previously had been owned by Whitman, who had sold it to Harnage.

Based on the September 28 cocaine discovery and other information, FBI Agent Evans approached Whitman and told her that she was under investigation for conspiracy to distribute cocaine and that she would be indicted and arrested unless she agreed to be a government informant. She decided to participate and signed an agreement with the government in early October 1984.

Whitman had been a cocaine dealer for about nine years before she became a government informant. During the time shortly before she was approached by Evans, Harnage had been her exclusive supplier. She had conducted a strong cocaine business during the spring of 1984, but Harnage hit a dry spell in May or June and could no longer furnish her with cocaine. Harnage assured Whitman that the operation would resume in the future. In the summer of 1984, Harnage first told Whitman of plans for a cocaine importation.

In mid-January 1985, after Whitman had begun working with the government, she accompanied Harnage to Santa Fe, New Mexico where Harnage learned that he could not get an airplane that he had expected to use for the importation venture. The next day, Whitman and Harnage drove to Albuquerque and met with appellants Albert Fortna and George Sharer to discuss the importation. On January 18, 1985, Whitman told Harnage that she might be able to assist with an airplane. She contacted the FBI, and FBI Agent John Martin agreed to act as a long-time friend of Whitman's and owner of a plane that might be used for the importation.

Harnage first spoke with Martin in a taped phone conversation on January 19, in which they agreed to meet in Denver later that week. On January 24, they had a meeting in Denver, also taped by the FBI, where Harnage explained the importation scheme and his need for an airplane. Harnage stated that he had to talk to his partner about getting money for Martin. In later phone conversations, Martin agreed that Harnage and his associates could inspect the plane in Dallas.

On February 1, Harnage and Whitman went to Dallas and met Martin and an undercover agent posing as a pilot. They went to the airport, where they met Harnage's associate William Schwarz, who was to fly as co-pilot. Schwarz inspected the plane and expressed his approval. Harnage said that Sharer would be coming to Dallas to make a dry run to Colombia.

On February 18, Fortna called Martin and identified himself as Harnage's partner. In this conversation and several others in the subsequent weeks, Fortna and Martin discussed arrangements for the importation and for payments to Martin. They had their first face-to-face meeting, which Harnage also attended, near the Dallas-Fort Worth airport on April 5. In the weeks that followed, Martin had several phone conversations and meetings with various participants as they finalized the plans for the importation. The plane was to leave from Dallas for Colombia, and was to return with the cocaine to Albuquerque. Martin learned that appellant Sharer, who speaks Spanish, was in charge of the logistics in South America. Martin also met Ronald Poland, whose role was to haul a portion of the cocaine to Los Angeles after its arrival in Albuquerque.

As the planned date of the importation neared, the participants assembled in Albuquerque. Martin met Harnage and Fortna on April 19 at the Barcelona Court Hotel there. Poland, Schwarz, and others arrived during the next few days. The co-conspirators discussed the plan and detailed the route the plane would take from Colombia to New Mexico. On April 21, Martin, Harnage, and other participants flew to Dallas. Appellant Christopher Reo and his brother Anthony arrived in Albuquerque on April 22. Poland testified that the Reos had been recruited by Sharer to assist in unloading the plane. Poland stated that he, Fortna, and the Reos went to examine the Alameda airport near Albuquerque, the proposed landing place for Martin's plane. Later that day, Fortna and Poland flew from Albuquerque to Dallas. Schwarz also arrived in Dallas that day.

On April 23, Harnage, Poland, and Schwarz were arrested in Dallas. Sharer apparently was not in Dallas that day and was arrested later. Based on information that Schwarz provided to the FBI, the Reo brothers were arrested in Albuquerque after the FBI observed them with Schwarz's van at the Barcelona Court Hotel. A search of their hotel room, pursuant to a warrant, produced notes and diagrams concerning traffic and police activity around the Alameda airport, a scanner, an antenna, and books containing radio frequencies used by law enforcement agencies.

Several of the arrested co-conspirators entered plea agreements with the government. The four appellants were tried together with Anthony Reo. Apart from cross-examination of government witnesses and character evidence as to Christopher Reo, none of the appellants presented any evidence in their defense. Because the jury was unable to reach a verdict concerning Anthony Reo, the district court granted him a mistrial. All four appellants were convicted of conspiracy to import cocaine in violation of 21 U.S.C. § 963.[1] In addition, Fortna and Harnage were convicted on various counts of using a telephone to facilitate the cocaine conspiracy in violation of 21 U.S.C. § 843(b). Fortna, Harnage, and Sharer were convicted also on various counts of traveling in interstate commerce to promote the conspiracy in violation of 18 U.S.C. § 1952. The offenses charged in the substantive counts—use of telephone and performance of interstate travel—were alleged to have been committed at various dates in January, February, March, and April 1985, the earliest date being January 28, 1985.

## Discussion

*Attorney-Client Privilege*

### 1. Harnage

▮ Appellant Harnage contends that the government impermissibly obtained evidence against him from James Smith in violation of his attorney-client privilege. Arguing that the government's use of this information violated his Fifth Amendment right to due process and privilege against self-incrimination and his Sixth Amendment right to counsel, Harnage contends that the district court should have quashed his indictment. At a pretrial hearing on the motion to quash, Harnage's attorney examined FBI Agent Evans, the main contact between Smith and the government. Based on Evans' testimony, the district court concluded that no attorney-client relationship was breached and thus refused to subpoena Smith for the hearing.[2] We agree with Harnage's claim that the district court abused its discretion in refusing to issue the subpoena.[3]

The district court concluded that Harnage failed to establish all the elements of the attorney-client privilege,[4] finding (1)

---

1. Count 1 of the indictment charges appellants with conspiring to import cocaine "[f]rom at least in [sic] or about January, 1985, and continuing to on or about April 23, 1985." The earliest of the overt acts alleged was "on or about January 16–19, 1985." The conspiracy alleged was one to import approximately one thousand kilograms of cocaine from the Republic of Colombia, by one or more conspirators traveling from the Dallas area to Colombia, acquiring the cocaine there and then transporting it or causing it to be transported to the Albuquerque area.

2. The district court previously had issued an order authorizing Smith's subpoena, and the subpoena had been served. However, the court held the subpoena in abeyance until after the pretrial hearing to determine whether Smith's testimony would be necessary. After the hearing, the district court released the subpoena,

finding that Harnage had failed to show a need to compel Smith's presence.

3. If the defendant avers facts which, if true, would be relevant to any issue in the case, the subpoena request should be granted unless the averments are facially incredible or the prosecution shows that the averments are untrue or the request is frivolous. *United States v. Bowman,* 636 F.2d 1003, 1013 (5th Cir.1981); *United States v. Long,* 578 F.2d 579, 581–82 (5th Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 263 (1978).

4. The district court relied upon the comprehensive definition of the attorney-client privilege set out in *In re Grand Jury Proceedings,* 517 F.2d 666 (5th Cir.1975):

"(1) the asserted holder of the privilege is or sought to become a client; (2) the person to

that Smith was not acting as a lawyer during their communications, (2) that their conversations occurred "in the presence of strangers," and (3) that "they met socially and for the purpose of committing a crime."

First, despite Smith's statements to Evans, Smith may have been acting as an attorney during his discussions with Harnage. Evans testified that Smith had been informed not to divulge information obtained in an attorney-client relationship. According to Evans, Smith said that Harnage had described his drug dealings to Smith, had shared cocaine with him, and had said he might need an attorney in the future. Smith agreed to accept a $1,000 retainer. Evans indicated that he had some concerns about an attorney-client relationship, even though Smith told him that he was not Harnage's attorney. Harnage stated, in an affidavit supporting his motion to suppress or to dismiss, that Smith told him he was performing legal services for Harnage. Harnage's affidavit also recites that he called Smith on September 28, 1984, after his car had been seized and he had been questioned by the FBI, and that in that conversation Smith first advised him that he could no longer act as Harnage's attorney.

Second, it is not clear whether the presence of third parties vitiated the confidentiality of all of Harnage's communications with Smith. Evans testified that when Smith met Harnage "there were third parties present at at least two of the meetings." When Harnage first met Smith, which was at Smith's home, Smith's wife was present. Evans described another meeting at which Smith, Smith's wife, Harnage, and Mark Hines, a pilot in Harnage's organization, discussed Smith's possible legal service concerning the crash of a plane full of marihuana. Although Smith refused to help on this matter, he also accepted a $1,000 retainer fee from Hines. Although the presence of a third person usually eliminates the confidentiality of the communication, the privilege is generally not waived if "a privileged communication is shared with a third person who has a common legal interest with respect to the subject matter of the communication." *Hodges, Grant & Kaufmann v. United States Government*, 768 F.2d 719, 721 (5th Cir.1985) (footnote omitted). Harnage's affidavit also stated that he discussed legal business with Smith on the telephone with no one else present.

Finally, although Harnage may not rely on the privilege if the "legal representation was secured in furtherance of intended, or present, continuing illegality," *United States v. Harrelson*, 754 F.2d 1153, 1167 (5th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985), Smith's mere use (possibly without payment) of the cocaine with Harnage during the communications may not have been in furtherance of the importation or distribution schemes that Harnage discussed with Smith. *See, e.g., United States v. Valencia*, 541 F.2d 618, 621 (6th Cir.1976).

Of course, Harnage had the burden of establishing, *inter alia*, that there was an attorney-client relationship which was breached by the disclosure of thereby privileged matter to the government, and we do not hold that the present record establishes such. However, there appears to be no good reason why Harnage should be precluded from challenging Evans' testimony in this respect or should be required to accept that testimony as the only relevant evidence, at least given Harnage's affidavit and the apparently undisputed fact that he

whom the communication was made (a) is [the] member of a bar or a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client." *Id* at 670 (quoting *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)); *see also United States v. El Paso Co.*, 682 F.2d 530, 538 & n. 9 (5th Cir.1982), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984).

paid Smith the $1,000 retainer. Smith's testimony could conceivably relate to matters showing a relevant attorney-client privilege between him and Harnage, as well as its breach by Smith. This is not to say that the district court would have to believe Smith or that Smith's testimony was indispensable; only that Harnage should not, without good cause, be denied the opportunity which he requested to present Smith as a witness. The district court also observed that even if Harnage made communications to Smith which were privileged by virtue of an attorney-client relationship between the two, nevertheless Harnage did not establish that Smith disclosed such privileged matter to the government. This, of course, would be peculiarly within the knowledge of the government and Smith; and Harnage should have been allowed the opportunity to present Smith's testimony, no good reason having been shown why Harnage's request to exercise this normally available right should be denied.

Accordingly, because of its refusal, without any good cause having been shown, to permit Harnage to consummate the subpoena of Smith for the hearing on the motion to quash as requested, we are unable to at this time accept the district court's determination that Smith did not furnish the government information received by him from Harnage which was confidential and privileged by virtue of an attorney-client relationship between them. We therefore direct the district court to reopen the hearing on Harnage's motion to quash the indictment to allow Harnage the opportunity to call Smith as a witness in respect to that matter, to make supplemental findings in light of any additional testimony, and to certify the transcript of the additional testimony, and the supplemental findings in a supplemental record to be furnished this Court.[5] We retain jurisdiction of Harnage's appeal pending receipt of the supplemental record.

■ In this connection, we do *not* now determine whether a violation of the claimed attorney-client privilege would either justify or require quashing Harnage's indictment. Although government intrusion into the attorney-client relationship may constitute a violation of a defendant's Sixth Amendment right to counsel, *United States v. Melvin*, 650 F.2d 641, 645 (5th Cir.1981), we note that this Sixth Amendment right does not attach until "at or after the initiation of adversary judicial criminal proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984) (citations omitted); *accord Moran v. Burbine*, —— U.S. ——, 106 S.Ct. 1135, 1145, 89 L.Ed.2d 410 (1986). Moreover, evidence obtained by governmental actions which violate an individual's Sixth Amendment rights with respect to an offense as to which adversary judicial criminal proceedings had been initiated when the actions occurred, is not inadmissible under the Sixth Amendment in a trial (or presumably in a grand jury proceeding leading to indictment) of the same individual for a different offense as to which adversary proceedings had not been initiated when those same actions took place. *Moran* at 1146; *Maine v. Moulton*, —— U.S. ——, 106 S.Ct. 477, 490 n. 16, 88 L.Ed.2d 481 (1985). And, even if Harnage were to establish a Sixth Amendment violation, the district court would need to determine whether there was sufficient prejudice to dismiss the indictment. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981); *United States v. McKenzie*, 678 F.2d 629, 631 (5th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982); *Melvin*, 650 F.2d at 644.

5. The district court, in its discretion, may receive and consider other supplemental evidence on this matter should it deem that appropriate. Should the district court find that Smith disclosed to the government information received from Harnage which was confidential by virtue of an attorney-client privilege between them, it will need to determine, and should receive evidence respecting, any relevant prejudice to Harnage respecting the offenses here at issue resulting from the disclosure.

Harnage also asserts that government misconduct in this regard violated his due process rights and his privilege against self-incrimination. Harnage's constitutional claims, which the district court did not address, raise issues that we deem it inappropriate to decide prior to receipt of any supplemental record to be furnished in accordance with our above directions. Testimony by Smith may further elucidate any connection between information provided by Smith and the conspiracy prosecution. A finding of a constitutional violation would require assessment of resulting prejudice before any remedy may properly be determined. When the government obtains evidence in violation of a defendant's Fifth or Sixth Amendment rights, "the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted." *Morrison,* 101 S.Ct. at 668 (citations omitted). Therefore, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate." *Id.* It is not clear whether information provided by Smith resulted in any demonstrable prejudice to Harnage in respect to the offenses here at issue: Smith did not testify at trial and Harnage does not indicate that Smith testified before the grand jury which brought this indictment. The government's mere discovery of Whitman as Harnage's associate and the government's use of potentially tainted information in recruiting Whitman to work undercover would not support suppression of evidence that she provided about the conspiracy. The government obtained this evidence of the conspiracy by means "sufficiently distinguishable to be purged of the primary taint." *United States v. Caldwell,* 750 F.2d 341, 343 (5th Cir.1984) (quoting *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)), *cert. denied,* — U.S. —, 105 S.Ct. 1873, 85 L.Ed.2d 166 (1985).[6]

### 2. *Fortna, Sharer, and Reo*

■ The remaining appellants [7] contest the district court's finding that they lacked standing to join Harnage's motion to quash the indictment based on a violation of his attorney-client privilege. We affirm the district court's ruling, because Harnage's Fifth and Sixth Amendment rights, like Fourth Amendment rights, are personal in nature and cannot be asserted vicariously. *United States v. Fredericks,* 586 F.2d 470, 480–81 (5th Cir.1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); *United States v. Scallion,* 533 F.2d 903, 916 (5th Cir.1976), *cert. denied,* 429 U.S. 1079, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977); *United States v. Palazzo,* 488 F.2d 942, 947–48 (5th Cir.1974).[8]

■ Appellants, other than Harnage, base their standing claim on *United States v. Valencia,* 541 F.2d 618 (6th Cir.1976), in which the Sixth Circuit invoked its supervisory authority to hold that, if the district court should find upon remand that defendants Valencia and Zeplin had been convicted based on evidence obtained in violation

---

**6.** We note that Whitman did testify during the government's direct examination that the FBI had recovered two kilograms of cocaine from the car that Whitman had sold to Harnage. Whitman also referred to this incident during cross-examination, although appellant's counsel did not question her specifically about it. However, even if admission of this testimony were to be error, it would not be grounds for reversal, as it bore only a background relationship to the offenses charged and the evidence of Harnage's guilt was overwhelming.

**7.** Because we affirm the district court's denial of these appellants' motions, we do not address the government's contention that Sharer failed to preserve this claim of error.

**8.** Of course, a defendant may in some circumstances have standing to claim that his own due process right to a fundamentally fair trial was violated by the *admission of statements* derived through shocking and intentional police misconduct. *United States v. Merkt,* 764 F.2d 266, 274 (5th Cir.1985); *Fredericks,* 586 F.2d at 480 & n. 14. However, even if Whitman's testimony at trial or at the grand jury could be viewed as derived from government misconduct concerning Smith, the government's conduct is far from the sort of egregious behavior that would constitute a due process violation of this character.

of co-defendant Randall Company's attorney-client privilege, the district court should order a new trial or dismissal of the indictments. *Id.* at 622. *Valencia* involved an egregious governmental intrusion into an attorney-client relationship by a paid government informant who acted as the secretary of Company's lawyer. While operating undercover, she divulged protected information including some of the attorney's files. Because the informant provided the government with information about Company after Company had been arrested, the Sixth Circuit concluded that Company's Sixth Amendment rights were implicated. *Id.* at 621. The Court cautioned, however, that a showing of prejudice was necessary to set aside the convictions. Thus, the Court remanded for a determination of whether tainted evidence was used to convict Company, holding that, if such evidence was used, Company was entitled to a new trial or dismissal of the indictment, "whichever is appropriate under the circumstances." *Id.* at 622. Relying on its supervisory powers, the Court granted the same relief to Company's co-defendants, even though they did not have an attorney-client relationship with Company's attorney. *Id.* at 621–22.

We do not believe that the case before us warrants the use of any supervisory authority we may have in the premises to grant these appellants the opportunity to assert a violation of Harnage's attorney-client relationship. In *Valencia,* the connection between the invasion of the attorney-client privilege and the conviction of the third parties is much closer than that asserted in the present case. The infor-

mant in *Valencia* provided the government with information about persons under investigation for a crime that had *already* occurred. This tainted evidence may have been the basis for the *Valencia* defendants' convictions. Any evidence derived here from a breach of Harnage's relationship with Smith was used not to convict appellants, but to permit the government to recruit an undercover informant who provided information about crimes that occurred *after* the claimed breach of the attorney-client privilege and that was not directly related to the events for which Harnage claims to have sought legal advice. The connection between the evidence against these other appellants and the potential intrusion into the Harnage-Smith attorney-client relationship is too attenuated to support suppression of the evidence.[9] We also note that, unlike the situation in *Valencia,* Harnage's Sixth Amendment rights are not clearly implicated because the alleged violation of the attorney-client privilege occurred before the initiation of adversary proceedings in this case. In general, the government's conduct here, even if assumed to be an intrusion into the privileged relationship, was not as egregious as that in *Valencia.*

Moreover, the Supreme Court's decision in *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), calls into question the Sixth Circuit's approach in *Valencia.* The Supreme Court held that the supervisory power of the federal courts does not authorize a court "to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." *Id.* at

---

**9.** In *Gissendanner v. Wainwright,* 482 F.2d 1293 (5th Cir.1973), we addressed defendants' claim that their identification in a line-up was tainted because their identities were obtained initially through the coerced confession of their co-defendant. We held that the rule of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), which excludes evidence that is the fruit of an illegal search or seizure, was not applicable. First, we noted that the illegally obtained confession was not introduced into evidence. Although *Wong Sun* is basically a rule of evidence, defendants sought in effect "an *immunity from prosecution* because the first

finger was put on them by reason of the violation of a third party's constitutional rights." *Id.* at 1296 (emphasis in original). We determined that for a defendant to raise such a claim he must show that (1) his identity was obtained *solely* through the invalid source, and (2) there was no likelihood that it would have been discovered through other police efforts. *Id.* at 1297. Second, we stated that defendants lacked standing to challenge the co-defendant's confession under *Wong Sun. Id.* at 1297–98. *See also United States ex rel. Cunningham v. DeRobertis,* 719 F.2d 892, 895–96 (7th Cir.1983).

2446. The Court determined that to use the supervisory power in this manner would upset the balance struck by the Court's Fourth Amendment decisions between society's interest in deterring government misconduct and society's interest in providing evidence to the trier of fact. *Id.* at 2446–47. The reasoning in *Payner* may apply in the present context as well, because similar interests are at stake in deciding whether to suppress evidence against a defendant that was obtained in violation of another defendant's right to counsel. Although the third party whose rights were potentially violated was also before the court in the present case, we believe that to grant standing to the other defendants in an effort to deter such misconduct could alter the balance struck by the Supreme Court decisions in this area. *See United States v. Gatto,* 763 F.2d 1040, 1046 (9th Cir.1985); *but see United States v. Omni International Corp.,* 634 F.Supp. 1414, 1436–40 (D.Md.1986). We thus are constrained to affirm the district court's denial of the attempt by Fortna, Sharer, and Reo to join Harnage's motion to quash the indictment.

### Limited Cross-Examination

Harnage claims that the district court's refusal to allow him to cross-examine Whitman about her relationship with Harnage and about a child that she had with him violated his Sixth Amendment right to confrontation. Although the district court would not allow cross-examination of Whitman about the child, Harnage's attorney was permitted to make an offer of proof outside the jury's presence. Whitman testified on this offer of proof that in 1981 she gave birth to a son whom she placed for adoption, and that Harnage was the father. She stated that she did not tell Harnage at the time of the birth, but informed him of the child in June or July 1984 and explained to him that he may see the child when the child is sixteen.

■ Harnage claims that this evidence demonstrates Whitman's bias against him, and thus its exclusion violated his right to confrontation. This Sixth Amendment right is satisfied when the defendant is permitted the opportunity " 'to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' " *United States v. Andrew,* 666 F.2d 915, 925 (5th Cir.1982) (quoting *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)). The exclusion of evidence relevant to the bias, prejudice, or ulterior motive of a witness may violate the Sixth Amendment. *United States v. Garza,* 754 F.2d 1202, 1206 (5th Cir.1985). Within the confines of the Sixth Amendment, however, the district court has broad discretion in restricting the scope of cross-examination, *Andrew,* 666 F.2d at 924, including how bias may be proved, *United States v. Leslie,* 759 F.2d 366, 379 (5th Cir.1985), relevant portion reinstated on reh'g, 783 F.2d 541 (5th Cir.1986) (en banc), *petition for cert. filed,* 54 U.S.L.W. 3811 (U.S. June 10, 1986) (No. 85–1961).

■ Harnage's attorney was permitted extensive cross-examination of Whitman concerning her relationship with Harnage. Whitman acknowledged that she had been in love with him in the past and that she had maintained a close friendship and working relationship with him. Harnage's attorney also asked Whitman whether her financial debt to Harnage affected her decision to cooperate with the government. In addition, Whitman stated that she slept with Harnage and used cocaine with him after she became a government informant. Although Harnage's attorney was permitted sufficient cross-examination concerning Whitman's relationship with Harnage generally, cross-examination about the child could have indicated a motivation for her testimony that was not otherwise demonstrated by the evidence. Thus, the district court may well have abused its discretion in this limitation on cross-examination. *Leslie,* 759 F.2d at 379 (defendant "should be afforded an opportunity to pursue all relevant lines of inquiry" in disclosing bias).

Nevertheless, we find that if this ruling were error, it was clearly harmless because Whitman was not a significant trial witness in the case against Harnage. Although she testified extensively about Harnage's prior cocaine distribution, she did not have such direct knowledge of the importation conspiracy. She attended only a few early meetings of those planning the smuggling venture and she did not play a key role in its operation. The testimony provided by FBI Agent Martin and the participants in the conspiracy provided evidence so overwhelming that it clearly established Harnage's guilt beyond all reasonable doubt. *Garza*, 754 F.2d at 1207.[10]

Harnage also argues that Whitman's disclosure of the child to Harnage after she became a government informant was part of an effort to entrap him. Harnage claims the district court abused its discretion in excluding his proffered cross-examination of Whitman in this respect based on its asserted relevancy to his entrapment defense. Yet, Harnage has not assigned as claimed error the district court's refusal to instruct the jury on entrapment. Further, the evidence shows overwhelmingly, and without the slightest dispute, Harnage's predisposition to commit the conspiracy charged, and his initiation of it. There was no conceivable basis whatever for an entrapment instruction. The cross-examination of Whitman made on Harnage's offer of proof showed only that she told Harnage about the child in June or July 1984, that Harnage did not appear interested in seeing the child, and that Harnage did not become more protective of her after learning about the child. This does not tend to show lack of predisposition on Harnage's part. Therefore, the district court did not abuse its discretion in concluding that the potential of this testimony for confusion of issues and prejudice outweighed any probative value it might have respecting entrap-

ment. Moreover, exclusion of the evidence was harmless.

*Outrageous Conduct*

■ Harnage further asserts that the government's use of the mother of his child in obtaining evidence against him was so outrageous that it violated his due process right to a fundamentally fair trial. We have noted that the defense of outrageous conduct may be invoked only "in the rarest and most outrageous circumstances." *United States v. Stanley*, 765 F.2d 1224, 1231 (5th Cir.1985) (citations omitted). In addition, each case must be considered individually under a totality of the circumstances standard. *Id.*; *United States v. Yater*, 756 F.2d 1058, 1065 (5th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985). Furthermore, the government's conduct must be evaluated "in light of the undercover activity necessary to the enforcement of the criminal laws." *United States v. Nixon*, 777 F.2d 958, 963–64 (5th Cir.1985).

The government's use of Whitman as an undercover agent and as a witness against Harnage is not conduct that offends the due process notions of fundamental fairness. The government often must rely on those in a close relation to the defendant to infiltrate criminal operations. We have addressed government misconduct more egregious than any asserted here and have found it to fall short of a due process violation. *See, e.g., United States v. Tobias*, 662 F.2d 381 (5th Cir.1981) (government suggested to defendant that he manufacture PCP and provided advice and equipment), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982). In this case, the government's use of Whitman simply is not "shocking to the universal sense of justice." *Yater*, 756 F.2d at 1065 (citations omitted).

---

**10.** Fortna also claims that it was error as to him to limit the defense opportunity to cross-examine Whitman about her child by Harnage to establish her animosity to Harnage. Again, if this were error it was harmless as to Fortna also, for our comments about Whitman's evidence being relatively insignificant against Harnage, and the testimony of Martin and the participants in the conspiracy constituting overwhelming proof of his guilt, apply with equal if not greater force to Fortna. We reject Fortna's claim in this respect also.

*Extrinsic Offenses Evidence*

Fortna argues that the district court should not have allowed Schwarz, an alleged co-conspirator, to testify that Fortna had been involved in cocaine and marihuana smuggling operations that occurred before the time period covered by the indictment.

In *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), we enunciated a two-part test for the admission of evidence pursuant to Rule 404(b) of the Federal Rules of Evidence.[11] First, to be admissible, the evidence must be relevant to an issue other than the defendant's character. *Beechum*, 582 F.2d at 911. When the government claims that the extrinsic offense evidence is relevant to the issue of the defendant's intent, as the government argues here, relevancy is assessed by comparing the state of mind required for the past and present offenses. *United States v. Gordon*, 780 F.2d 1165, 1173–74 (5th Cir.1986); *Beechum*, 582 F.2d at 911. Schwarz testified that in the past he had flown as co-pilot bringing loads of cocaine and marihuana into the United States in smuggling ventures that involved Harnage and Fortna. Because Schwarz described prior smuggling operations very similar to the one alleged in the indictment, his testimony is clearly relevant to the issue of intent. *See United States v. Nichols*, 750 F.2d 1260, 1265 (5th Cir.1985) (evidence of defendant's involvement in earlier cocaine runs admissible to prove transporting cocaine).

The second prong of the *Beechum* standard requires that the probative value of the evidence not be substantially outweighed by its undue prejudicial effect. 582 F.2d at 911. Fortna argues that the evidence should be excluded because he did not expressly place intent in issue. He relies on the following statement in *Beec-*

*hum:* "If the defendant's intent is not contested, then the incremental probative value of the extrinsic offense is inconsequential when compared to its prejudice; therefore, in this circumstance the evidence is uniformly excluded." *Id.* at 914 (footnote omitted). We have since concluded, however, that extrinsic offense evidence may be admitted to prove intent in conspiracy cases. *United States v. Mergist*, 738 F.2d 645, 649–50 (5th Cir.1984). In *United States v. Roberts*, 619 F.2d 379 (5th Cir. 1980), we observed that the conspiracy offense involves an element of intent that is often difficult to prove. *Id.* at 382–83. We concluded that in every conspiracy case "a not guilty plea renders the defendant's interest a material issue." *Id.* at 383. Therefore, evidence of extrinsic offenses is admissible unless the defendant "affirmatively take[s] the issue of intent out of the case." *Id.* (citations omitted). Furthermore, because of the unique nature of the conspiracy offense, extrinsic offense evidence may be admissible in some instances even when the defendant concedes the issue of intent, removing it as an issue in the case. *Mergist*, 738 F.2d at 650; *Roberts*, 619 F.2d at 383. Fortna did not concede the issue of intent in this case.

We conclude that the district court did not abuse its discretion in admitting Schwarz's testimony. Although prejudicial to Fortna, the evidence was not likely to have been misused by the jury under the facts of this case. There was no more, indeed there was less, reason for the jury to credit Schwarz's testimony about the prior drug smuggling than to credit his well-corroborated testimony about the instant offenses and Fortna's involvement therein. In addition, the district court instructed the jury that the evidence could be used only for the limited purpose of proving intent. *See* note 12, *infra*. Moreover, Schwarz's description of prior drug smuggling operations that involved similar plans

---

11. Fed.R.Evid. 404(b) provides:
 "**Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

and some of the same participants was highly probative to the issue of intent in this case. It was also relevant to the related issue of knowledge. We therefore reject Fortna's claim.

*Severance*

 Appellants Sharer and Reo contend that the district court abused its discretion in denying their motions for severance (and Sharer's motion for mistrial) because of the prejudicial effect of the evidence of prior drug involvement offered against Harnage and Fortna. The district court's decision should be reversed only if appellants were "unable to obtain a fair trial without a severance" and can "demonstrate compelling prejudice against which the trial court [was] unable to afford protection." *United States v. Harrelson,* 754 F.2d 1153, 1174 (5th Cir.) (citations omitted) (no severance warranted despite evidence of prior criminal dealings of co-defendant), *cert. denied,* —— U.S. ——, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985); *accord United States v. Lamp,* 779 F.2d 1088, 1093 (5th Cir.) (similar ruling in complex conspiracy case), *cert. denied,* —— U.S. ——, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986). Sharer and Reo must demonstrate a quantitative and qualitative difference in the evidence offered against them extreme enough to necessitate severance, and any prejudice must be balanced against the public's interest in efficient judicial administration. *Harrelson,* 754 F.2d at 1175–76. The "spillover" effect that those appellants claim resulted from the prior crimes evidence against their co-defendants usually is best avoided "by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the government." *Id.* at 1175 (quoting *United States v. Morrow,* 537 F.2d 120, 136 (5th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977)).

During the testimony, the district court cautioned the jurors that certain evidence of prior drug dealings should be considered only against Fortna and Harnage. Appellant Sharer points to one instance, however, in which the district court admitted evidence of prior drug transactions against all defendants subject to further connection. The court permitted the introduction of cocaine that Whitman had obtained from Harnage before January 1985. Although Reo and Sharer were never implicated in any drug involvement that occurred before the conspiracy, any prejudice to them resulting from admission of this evidence was minimal, in light of their ultimately evident lack of connection to this challenged event and all the other testimony against them, and was cured by the court's closing charge to the jury. *See Harrelson,* 754 F.2d at 1175; *United States v. Loalza-Vasquez,* 735 F.2d 153, 159 (5th Cir.1984). The district court in its final charge carefully explained the proper use of the prior crimes evidence.[12]

 Finally, Sharer and Reo suggest that a severance is required when a

---

**12.** The district court instructed the jury:

"During the course of the trial certain evidence has been presented concerning alleged transactions similar to the acts charged in the indictment. Specifically, evidence has been introduced that the Defendants Fortna and Harnage participated in other narcotics transactions.

"This evidence, if you choose to accept it, is admitted for the limited purpose of assisting you in determining the intent with which those Defendants may have acted. In this regard, you are instructed that evidence of similar transactions may not be considered by the Jury in determining whether an accused committed the acts or participated in the activity alleged in the indictment.

"Nor may evidence of such similar transactions be considered for any other purpose whatever unless the Jury first finds that the other evidence in the case standing alone establishes beyond a reasonable doubt that the accused participated in the activity alleged in the indictment.

"If you should find beyond a reasonable doubt from other evidence in the case that the accused participated in the activity alleged in the indictment, then you may consider evidence as to the similar transactions in determining the state of mind or intent with which the accused did the act charged in the indictment.

"I want to instruct you very explicitly and unequivocally as to the very limited nature to which you may consider this evidence as to a similar offense."

defendant is alleged to be only peripherally involved in a conspiracy. The quantum of proof offered against a defendant should be considered in ruling on a motion for severance. *Harrelson,* 754 F.2d at 1175–76. Nevertheless, a defendant is not necessarily entitled to a severance when his alleged involvement in the conspiracy is minimal. *United States v. Hogan,* 763 F.2d 697, 705 (5th Cir.1985); *Harrelson,* 754 F.2d at 1178 n. 21. Sharer and Reo have failed to demonstrate that the quality and quantity of evidence offered against them and their alleged co-conspirators required the district court to grant their motion for severance.[13]

*Motions to Suppress*

1. *Sharer*

 Sharer argues that the district court erred by admitting evidence obtained from him by customs agents at the Dallas-Fort Worth airport assertedly in violation of his Fourth Amendment rights. On April 5, 1985, Fortna and Sharer arrived at the Dallas-Fort Worth airport on a flight from Mexico City and went through customs inspections. The customs officials who examined Sharer's carry-on bag discovered several documents, including a topographical map of northern Mexico on which airstrips had been circled, a handwritten note saying "Pick up pilot in Miami," and two airline tickets made out to Sharer for flights to Bogota, Colombia. The customs agents photocopied these documents and others and returned the originals to Sharer. The photocopies were admitted into evidence over Sharer's objection.

Sharer acknowledges the legality of the temporary detention, but claims that the customs officials unlawfully searched his luggage and photocopied his documents.

The search itself—including inspection of Sharer's personal belongings—was clearly justified because he was crossing an international border. *United States v. Mejia,* 720 F.2d 1378, 1381 (5th Cir.1983) ("Searches at the border are reasonable simply because they occur at the border."); *United States v. Sandler,* 644 F.2d 1163 (5th Cir.1981) (en banc). Furthermore, "[t]he greater the level of suspicion, the more intrusive the search may be." *Mejia,* 720 F.2d at 1382. Our assessment of intrusion "is keyed to embarrassment, indignity, and invasion of privacy." *Id.* For example, in *Mejia* we found that an abdominal X-ray performed at a hospital by hospital personnel after the suspect was questioned about his health history was not excessively intrusive and was supported by customs officers' "reasonable suspicion" that the suspect was smuggling drugs. *Id.* at 1381–82. Here, however, the initial examination of the documents was clearly proper, as we have noted. Sharer hence had no legitimate expectation that these papers would be kept private from the customs officials. *Cf. Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). It may therefore be questioned whether anything more must be shown to justify the photocopying, which merely memorialized the agents' observations and provided a means to verify any subsequent recounting of them. *See United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971). We do not suggest that customs agents may photocopy material inspected at the border for other than good faith, legitimate governmental purposes. Plainly, the photocopying here was well within such parameters. The documents not improperly aroused the agents' suspicion that they might relate to some illegal conduct involving material or per-

---

**13.** Reo relies on *United States v. Romanello,* 726 F.2d 173 (5th Cir.1984), which holds that severance is warranted when co-defendants have defenses "antagonistic to the point of being irreconcilable and mutually exclusive." *Id.* at 177. Severance may be required "if only one defendant accuses the other, and the other denies any involvement." *Id.* In *Romanello,* the jury was, as a practical matter, unable to believe the de-

fense of some defendants without rejecting the defense of another defendant. Reo argues here that his testimony is inconsistent with that of Poland and thus a severance is required. Unlike the situation in *Romanello,* however, Poland plea bargained and then testified against Reo. Reo's defense was not mutually exclusive of the defense of another defendant on trial.

sons entering or leaving the United States. The customs agent who examined the map had fifteen years of experience with the United States Customs Service and was familiar with the area of northern Mexico depicted by the map. His suspicion that Sharer was involved in some illegal activity involving the United States borders was legitimate. The photocopying was for a proper governmental purpose. We reject Sharer's claim that the photocopying violated his rights.

### 2. Reo

Reo asserts that his warrantless arrest was made without probable cause and that accordingly the fruits of the arrest should have been suppressed. A search of Reo's hotel room pursuant to a warrant the day after his arrest produced a pad containing notes and diagrams concerning the pedestrian and vehicle traffic around the Alameda airport and the frequency of police activity in the area. The FBI also discovered a scanner, an antenna, and books containing radio frequencies used by various law enforcement agencies nationwide.

The district court conducted a mid-trial hearing out of the presence of the jury on Reo's motion to suppress. FBI Agent Stanley Jacobsen testified that, prior to Reo's arrest on April 23, 1985, he had knowledge of a cocaine importation conspiracy involving Harnage, Fortna, and others, and that the co-conspirators had met at the Barcelona Court Hotel in Albuquerque, New Mexico. He knew that the plan called for an aircraft to leave Dallas to pick up the product and to return to Albuquerque, and for other co-conspirators to be available in Albuquerque to unload the plane. He had information that the off-loaders were to arrive in Albuquerque around the twenty-first to the twenty-third of April and that the plane was not to leave Dallas until the off-loading crew was in place in Albuquerque. In addition, Fortna, a known member of the conspiracy, had been observed driving a maroon van while he was in Albuquerque.

On April 23, Schwarz was arrested in Dallas. He then told the FBI that he had purchased a maroon van with drug proceeds and had left it with Fortna in Albuquerque, that anyone driving the maroon van would be involved in the importation venture, and that the off-loaders might use the van. An FBI agent in Dallas related this information to Jacobsen, who was in Albuquerque. Later that day, FBI agents in Albuquerque observed a man take the maroon van from the Barcelona Court Hotel to a Midas Muffler Shop. On this trip, the van was followed by another unknown individual in a Cutlass. The driver of the van left it at the muffler shop and got into the Cutlass. He and the driver of the Cutlass returned to the basement parking lot of the Barcelona Court Hotel where both were arrested. It was later discovered that appellant Christopher Reo had driven the Cutlass and that his brother Anthony had driven the van. Jacobsen testified that the FBI agents had explained the circumstances to an Assistant United States Attorney in Albuquerque, and that the attorney had advised the FBI to arrest both individuals. Jacobsen's testimony was corroborated by other FBI agents who observed the maroon van and participated in the arrests.

The Fourth Amendment does not require a warrant for an arrest made on probable cause. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Probable cause for arrest exists "when the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant in a person of reasonable caution the belief that an offense has been or is being committed." *United States v. Maldonado*, 735 F.2d 809, 815 (5th Cir. 1984) (quoting *United States v. Woolery*, 670 F.2d 513, 515 (5th Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982)). We believe that the FBI agents in Albuquerque had reasonably trustworthy information to support their belief that an offense was being committed. Whitman and Martin had provided reliable information about the importation scheme, its participants, and their use of the Barcelona

Court Hotel as a meeting place. The statements made by Schwarz after his arrest were corroborated by the FBI's prior observation of Fortna's driving the maroon van near the Barcelona Court Hotel. Because the FBI had reason to believe Schwarz's account, his statement that anyone driving the maroon van would be involved in the conspiracy provided probable cause for the FBI to arrest the persons who together took the van to the muffler shop and then returned to the hotel which was serving as the local headquarters for the conspiracy. We therefore uphold the district court's admission of the evidence obtained pursuant to Reo's arrest.

*Sufficiency of the Evidence*

1. *Sharer*

Sharer was convicted on count 1 for conspiring to import cocaine in violation of 21 U.S.C. § 963, and on count 21 for traveling in interstate commerce with intent to facilitate unlawful activity in violation of the Travel Act, 18 U.S.C. §§ 2, 1952. Sharer's counsel moved for a judgment of acquittal on the Travel Act count, but failed to do so on the conspiracy count.

 When a defendant has failed to move for a judgment of acquittal, our review is limited to whether the conviction constitutes a miscarriage of justice. *United States v. Maldonado*, 735 F.2d 809 at 817. Sharer's conviction for conspiracy to import cocaine is supported by the testimony of co-conspirator Schwarz, who described meeting with Sharer to discuss the smuggling venture. Agent Martin also described meetings concerning the importation in which Sharer participated. Martin testified that when Fortna told him in Sharer's presence that Sharer was responsible for the "logistics down south," Sharer demonstrated his fluency in Spanish and made

other comments acknowledging his role in the conspiracy. In addition, Poland explained that when the plane arrived in Albuquerque, Sharer was to participate in unloading the plane. He also testified that Sharer had persuaded Fortna to hire the Reos to assist in unloading. Finally, the documents photocopied upon Sharer's arrival at the Dallas-Fort Worth airport, including the topographical map indicating landing sites in northern Mexico, also provide evidence of his guilt. Because the jury verdict in this respect is clearly supported by the evidence, we find that Sharer's conspiracy conviction is not a miscarriage of justice.

 In reviewing Sharer's conviction on the Travel Act count, we must examine all the evidence and reasonable inferences in the light most favorable to the government and determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Prieto-Tejas*, 779 F.2d 1098, 1101 (5th Cir.1986). We find that a reasonable trier of fact could conclude that Sharer traveled from Mexico to Dallas, Texas on April 5, 1985, with the intent of promoting the importation conspiracy and that he thereafter performed or attempted to perform acts in furtherance of the conspiracy.[14] The documents found in Sharer's possession upon his arrival at the Dallas-Fort Worth airport, together with the co-conspirator testimony that Sharer was responsible for arrangements outside the United States, indicate that his trip was for the purpose of promoting the conspiracy. Moreover, Poland's testimony that Sharer recruited the Reos, which was corroborated by the admission of a note with the Reos' phone numbers found in Sharer's possession at the customs inspection, demonstrates that he acted in furtherance of the conspiracy. The evidence is

---

**14.** 18 U.S.C. § 1952(a) provides:

"Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(1) distribute the proceeds of any unlawful activity; or

"(2) commit any crime of violence to further any unlawful activity; or

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

"and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,-000 or imprisoned for not more than five years, or both."

plainly adequate to support Sharer's conviction on count 21.

### 2. *Reo*

Reo argues that, absent the hearsay testimony and the evidence seized in his hotel room (which he argues should have been suppressed), the remaining evidence is insufficient to support his conviction on count 1 for conspiring to import cocaine. To obtain a conviction in a conspiracy case, the government must establish beyond a reasonable doubt that the conspiracy to violate the law existed, and that the defendant had knowledge of the agreement, intended to join it, and participated in it. *Prieto-Tejas,* 779 F.2d at 1102; *United States v. Aguirre Aguirre,* 716 F.2d 293, 297 (5th Cir.1983). In a drug conspiracy case, the government need not prove an overt act in furtherance of the conspiracy. *Prieto-Tejas,* 779 F.2d at 1103. In addition, a common purpose or plan may be inferred by concert of action or from a "development and a collocation of circumstances." *Id.* (citations omitted).

We believe that Poland's testimony, as well as the items found in Reo's hotel room, which we have found were properly admitted, adequately support Reo's conviction. Poland testified that he met Reo and his brother in Albuquerque on April 22 and that they traveled to the Alameda airport to make plans for the plane's arrival. Poland explained that as the plane taxied down the airstrip, Schwarz was to throw the bags from the plane. The Reos were to throw the bags over the fence and place them in the van purchased by Schwarz. The evidence taken from Reo's hotel room corroborated Poland's testimony. These items would have facilitated the Reos in escaping detection while they unloaded the plane. Furthermore, Schwarz's testimony and the circumstances surrounding Reo's arrest also provide evidence of his involvement in the conspiracy. We conclude that a reasonable trier of fact considering this evidence could find that it established Reo's guilt beyond a reasonable doubt.

### *Jury Instructions on Credibility*

Reo also challenges the district court's communication to the jury during their deliberations. The jury sent a note to the district court that inquired whether they should consider the trial testimony by the Reo brothers that they thought the conspiracy involved marihuana instead of cocaine.[15] The district court, after hearing objections of counsel to its proposed response, referred the jury to its previous charge on conspiracy and to its charge on witness credibility.[16]

Reo's only contention in this respect is, and his only objection below was, that the district court's response to the jury placed undue emphasis on credibility and suggested to the jury that the court did not believe Reo's statement. Reo relies on *United States v. Holland,* 537 F.2d 821 (5th Cir. 1976), in which the court's instructions to the jury suggested statements about the jury's credibility choices that were not supported by the law. In the present case, however, the district court's instructions correctly state the law. We find that the district court's response to the jury is not subject to the objection made by Reo here and below, and in this respect did not go beyond the district court's broad discretion in instructing the jury, which includes the right to comment on the evidence. *See Sandidge v. Salen Offshore Drilling Co.,* 764 F.2d 252, 261–62 (5th Cir.1985).

### Conclusion

Finding no reversible error, we affirm the convictions of appellants Fortna, Shar-

15. The district court read the jury's note into the record: "Your Honor: Count 1: It says cocaine only—there is a question, if we regard what the Reo brothers said, they thought it was marijuana—would that be considered"

16. The district court responded:
"I have your note regarding Count 1. As you know, that is the conspiracy count. Please refer to the Court's charge commencing on page nine for the conspiracy instructions which run through page 12A. As far as, quote, what the Reo brothers said, unquote, please refer to the Court's charge on credibility on page 4. You are the sole judges of the credibility or believability of all witnesses, including the Reo brothers."

er, and Reo. We reject all of Harnage's claims of reversible error, except only his claim that the indictment should have been quashed as to him because Smith assertedly furnished the government information which Smith had received from Harnage as confidential information pursuant to their attorney-client relationship, the disclosure of which by Smith violated the attorney-client privilege between them. As to this latter claim, we withhold judgment, and we retain jurisdiction of Harnage's appeal, pending the district court's completion of the further hearing we have ordered on the motion to quash and supplementation of the record with the hearing transcript and the district court's findings as previously set out herein, following which we will take final action on Harnage's appeal.

The convictions of appellants *Fortna*, *Sharer*, and *Reo* are **AFFIRMED**, and their appeals are hereby **SEVERED** from Harnage's; with respect to the conviction of appellant *Harnage*, we **RETAIN JURISDICTION OF THE APPEAL** and **IT IS HELD IN ABEYANCE** pending supplementation of the record as herein directed.