UNITED STATES of America, Plaintiff,

v.

James HARNAGE, Richard Sahli, James Whitesel, Gary Schelling, Betsy D. Rohde, Michael Patey, and James Harkins, Defendants.

Crim. A. No. 86–CR–239.

United States District Court,
D. Colorado.

June 10, 1987.

Robert B. Miller, Miller, Hale & Harrison, Boulder, Colo., for Richard Sahli.

Jeffrey A. Springer, Denver, Colo., for James Whitesel.

Irv Bornstein, Arthur M. Schwartz, P.C., Denver, Colo., for Gary Schelling.

Patrick J. Burke, Denver, Colo., for Betsy D. Rohde.

Joseph Saint-Veltri, Denver, Colo., Robert W. Cook, Boulder, Colo., for Michael Patey.

Michael Axt, Denver, Colo., for James Harkins.

William D. Welch, Asst. U.S. Atty., Denver, Colo., for the U.S.

ORDER ON PENDING MOTIONS

KANE, District Judge.

## I.

## INTRODUCTION

This criminal matter is before me now on defendants' 17 pending motions which I took under advisement at three pretrial hearings conducted on October 24, 1986, January 16, 1987, and January 20, 1987. Also, since the hearings defendants have filed various motions and supporting briefs. Of the 65 total motions filed in this case, I already have ruled on several of them from the bench and by minute order. The several motions to strike overt acts and certain counts of the indictment and to quash the indictment have been denied. The several motions for a *James* hearing in order to determine the admissibility of co-conspirator statements also have been denied or withdrawn. The government has complied with virtually all of the discovery motions. Two of the seven motions to dismiss have been denied. Also, several motions have been rendered moot throughout the pretrial stage.

Two named defendants of the 11–count indictment are no longer scheduled for trial. James Harnage was dismissed on October 19, 1986. He is serving a 100–year federal sentence in Texas and Florida pursuant to the verdicts in the companion case to this alleged conspiracy. He filed no motions in this action. Betsy D. Rohde negotiated a plea agreement with the U.S. Attorney's Office and pled guilty on December 5, 1986. Obviously, all of her motions are moot. Thus, there are only five remaining defendants named in the original indictment scheduled for trial.

## II.

## BACKGROUND [1]

From June 1983 through June 1985, these defendants allegedly participated in a conspiracy to distribute cocaine. The government asserts defendants would fly to Tampa, Florida, purchase substantial amounts of cocaine, and then return to Boulder, Colorado in order to sell it. Defendants also allegedly obtained large amounts of cocaine in Columbia and smuggled it into the United States with a light King Aire private aircraft. It is also charged that defendants would either meet in person, or communicate by telephone or mail, in various cities throughout the United States in furtherance of the conspiracy.

These alleged activities were executed in violation of the following statutes: 21 U.S.C. §§ 841(a)(1) and 846 (for possession and distribution of cocaine and the cocaine conspiracy itself); 18 U.S.C. §§ 1952 and 2 (for interstate travel to facilitate the conspiracy); and, 21 U.S.C. 843(b) (for using the telephone and mail service to further the conspiracy). There is an additional charge against Richard Sahli for income tax evasion and for filing a fraudulent return for the calendar year 1984 in violation of 26 U.S.C. § 7206(1).

Two unindicted individuals, attorney James Smith and Ms. Linda Whitman, were heavily involved with defendants' alleged drug activities. Mr. Smith admittedly used cocaine and had a drug dependency problem. He was involved with these defendants at various times in either a professional capacity, or a personal capacity, or both. He became an informant for the F.B.I. in this matter although none of the information or recorded evidence he obtained will be used by the government at trial. After Smith became an informant, Linda Whitman also became an informant for the F.B.I. and has been granted immunity for her cooperation. The government plans to use the evidence Ms. Whitman has obtained at trial.

## III.

## RESOLUTION OF THE PENDING MOTIONS

The motions which I now rule upon consist of six motions to sever, three motions

---

1. For a more complete statement of the facts, see the companion case of *United States v. Fort-*
*na,* 796 F.2d 724 (5th Cir.) *cert. denied,* —— U.S. ——, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986).

to dismiss, five motions to suppress, and three "miscellaneous" motions.

## A. MOTIONS TO SEVER

### 1. *Sahli's Motion for Relief from Prejudicial Joinder.*

Sahli requests severance of the tax evasion count (Count II) and the telephone count (Count X), because the conspiracy charge supposedly would taint the jury's judgment and ability to keep the tax evasion count separate. He also wishes to testify as to the tax count but not to the conspiracy count. Because of the purported resulting prejudice, he argues he would be chilled in his desire to testify as to the tax count in order to exercise his Fifth Amendment right not to testify as to the conspiracy count.

█ In *United States v. Strand*, 617 F.2d 571 (10th Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980) (holding it is not an abuse of discretion to refuse to grant defendant's motion for severance where interrelationship of evidence vis-a-vis the two charges was clear and inseparable and court properly instructed jury on separate nature of the offenses charged) the Tenth Circuit held a tax evasion count is logically related to the illegal funds generated by fraud in the sale of securities. Although the drug trafficking in the instant case and the fraud in the sale of securities in the *Strand* case may be wholly different activities, for purposes of joinder with a tax evasion count, the two illegal activities are analogous because they are simply alternate ways of generating illegal funds. Accordingly, joinder with a tax evasion count is proper in both instances because the illegal funds are directly related to the illegal activities used to raise them.

There is a logical relationship between the illegal funds generated by illegal activities regardless of whether the "illegal activities" are drug trafficking or securities fraud. Moreover, a proper jury instruction would remove any such "prejudice." Finally, Sahli has not made any specification as to the testimony he would offer at a separate trial. Without such specification, a trial court cannot even begin to evaluate possible prejudice. *United States v. Montes-Cardenas*, 746 F.2d 771, 778 (11th Cir.1984) (defendant failed to explain how he would testify at a severed trial or how a joint trial would prejudice him, thus, the bare allegations of prejudice did not give the trial judge a factual basis on which to rule and the motion was therefore denied).

The Tenth Circuit has formulated a stringent test to show prejudice:

> The decision to grant a severance is within the sound discretion of the trial court and its decision will not ordinarily be reversed in the absence of a strong showing of prejudice. [citation omitted]. A trial court may grant a severance if it appears that the defendant or Government is prejudiced by joinder. [citation omitted]. *In order to obtain a severance, a defendant must show clear prejudice resulting from joinder at trial.* [citation omitted]. *The fact that severance would improve chances for acquittal is not sufficient.* [citation omitted]. (emphasis added).

*United States v. Strand, supra,* at 575.

The motion is denied. Defendant has failed to make the necessary showing of prejudice resulting from joinder. Judicial economy outweighs any possible or speculative prejudice.

### 2. *Whitesel's Motion for Severance (for Relief from Prejudicial Joinder).*

This motion is based on the allegation that the Rule 801(d)(2)(E), Fed.R.Evid., co-conspirator hearsay statements (allowed under that exception) do not refer to Whitesel, but instead, refer to actions committed by the co-conspirators "with someone else in the past" and not in "furtherance" of the conspiracy. Thus, the statements are not admissible in a joint trial against this defendant. Also, Whitesel argues the vast difference in quantity and quality of evidence makes the "spillover effect" irreparably prejudicial.

█ The government argues all of these defendants are part of the same conspiracy, thus making the 801(d)(2)(E) co-con-

spirator hearsay statements applicable to each defendant. I shall make this determination at trial. If certain statements are not part of the conspiracy or are hearsay, not falling under the Rule 801(d)(2)(E) exception, then defense counsel may argue for the inadmissibility of such statements at the time of trial. A hearing before trial, however, is not required by *United States v. James*, 590 F.2d 575 (5th Cir.) *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). *See United States v. Petersen*, 611 F.2d 1313 (10th Cir.) *cert. denied* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980) (holding a pretrial *James* hearing is not required in this circuit, the parties need only follow the preferred order of proof rule). *See also United States v. Nichols*, 695 F.2d 86, 90 (5th Cir.1982). The motion is premature and should be made at trial, if warranted.

■ Further, the alleged "spillover effect" of the evidence against a co-defendant is insufficient in establishing prejudice justifying severance. *United States v. Barker*, 623 F.Supp. 823, 834, (D.Colo. 1985). Also, I held in *United States v. Pees*, 645 F.Supp. 697 (D.Colo.1986) that disparate quantity and quality of evidence is insufficient to justify prejudice.

> [D]isparity in the quantity and quality of evidence does not justify severance, *United States v. Dill*, 693 F.2d 1012, 1014 (10th Cir.1982), "the fact that the prosecution may have a stronger case against one defendant than against a co-defendant does not entitle either defendant to a separate trial."

*Pees* at 701.

The motion is denied.

3. *Harkins' Motion for Relief from Prejudicial Joinder.*

The arguments in this motion repeat those above and to that extent the motion is denied. Additionally, however, Harkins claims, his role was so "minute" in the

conspiracy, it would be unfairly prejudicial to try him with these other defendants.

■ I recognize that at some point, evidence conceivably could become so disparate that severance would be appropriate [2] (especially if the jury could not compartmentalize the evidence and no instruction could clear up the confusion); however, although this defendant may be closer to that point than his co-defendants, he still fails to make a showing of prejudice necessary to justify severance. *United States v. Dill, supra; United States v. Barker, supra; United States v. Strand, supra.*

Harkins is involved in this alleged conspiracy, albeit to a lesser degree. In a large conspiracy, obviously not all players are going to have an equal role—the level of involvement is often very different. Not having an equal role, however, is not enough to warrant a severance. There must be at least an articulable prejudice created by the joinder. Other than stating a mere conclusion, Harkins has failed to specify with any meaning just how he would be prejudiced by joinder. Accordingly, the motion is denied.

4. *Schelling's Motion for Severance.*

Schelling's arguments are the same as those advanced by Harkins. Again, the real question is how well can the jury be instructed to keep the evidence straight and not confuse the issues. Schelling, like Harkins, has made no showing of prejudice sufficient to justify severance, thus, the motion is denied.

5. *Patey's Motion for Trial Severance from Co-Defendants.*

The arguments contained in this motion already have been discussed, except for the proposition that this particular defendant should be granted a separate trial because he could obtain exculpatory evidence from two co-defendants (Whitesel and Schelling) *provided* their trial(s) end first.

---

**2.** Rule 14, Fed.R.Crim Proc., states in pertinent part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or informa-tion or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of the defendants or provide whatever other relief justice requires.

The government argues defendant has failed to make the necessary showing in order to grant such a motion. According to Tenth Circuit law, a defendant generally must show: (1) a *bona fide* need for the testimony, (2) the substance and exculpatory nature of the testimony, and (3) the substantial likelihood that the co-defendant would indeed testify at a separate trial. *United States v. McConnell*, 749 F.2d 1441, 1446 (10th Cir.1984). In *McConnell*, the Tenth Circuit set forth the factors to be considered in such circumstances as follows:

> 1) the likelihood that the co-defendant would in fact testify at the movant's severed trial and waive his Fifth Amendment privilege; 2) the significance of the testimony in relation to the defendant's theory of defense; 3) the exculpatory nature and effect of such testimony; 4) the likelihood that the co-defendant's testimony would be impeached; 5) the extent of prejudice caused by the absence of the testimony; 6) the effect of a severance on judicial administration and economy; 7) the timeliness of the motion. [citations omitted].

█ Absent such a showing, no prejudice is apparent. At this point, defendant's assertions are too speculative. More specificity and particularity is needed before defendant can even begin to meet the necessary standards set forth in *McConnell*. The motion is denied.

### 6. Patey's Motion for Trial Severance of Counts I and XI.

For the same reasons stated directly above, Patey argues Counts I and XI should be severed. For the same reasons stated above, the motion is denied.

### B. MOTIONS TO DISMISS

Defendants' motions to dismiss are based on the government's use of Mr. James Smith, a former attorney, as an informant and the use of Ms. Linda Whitman, a former client of Mr. Smith's, as an informant. The basic facts are as follows:

In April, 1984, an unrelated investigation of Mr. James Smith determined that he was involved in the illegal use of cocaine. During this time, Mr. Smith held himself out as an attorney who was accomplished and experienced at representing suspects accused of being cocaine dealers. Mr. Smith himself was a heavy user of cocaine who on some occasions accepted cocaine as payment for his legal services. During the course of the investigation and interrogation of Mr. Smith, the Aurora Police Department and the F.B.I. discovered the names of at least thirty people whom Mr. Smith related were involved with illegal drug use and drug trafficking. Some of those named were at various times clients of Mr. Smith's. Defendants were named as part of those involved in the illegal use of drugs. The timing and nature of Mr. Smith's representation of defendants and other drug associates is disputed.

The F.B.I., in an effort to pierce the large suspected conspiracy, decided to employ Mr. Smith as an informant. Mr. Smith agreed and proceeded to record his many conversations and drug dealings with his "clients" and other "associates." At this point, the term "client" begins to have muddled meanings. Many of Mr. Smith's drug associates were clients or former clients of his law practice. Accordingly, there is a semantic difficulty with attempting to apply the attorney-client privilege to activity not contemplated by "customary" or "routine" or lawful attorney-client relations. Suffice it to say the relationship between Mr. Smith and his "clients" involved much more than the interaction the law seeks to protect with the attorney-client privilege and the duties imposed by the Code of Professional Responsibility. This case presents a paradigm of the tension between encouraging clients to be frank and honest with their attorneys (assuming a *bona fide* attorney-client relationship exists), and suppressing valuable, relevant, and reliable evidence from the trier of fact because an attorney, thus employed, can sell "secrecy" and "protection" to a criminal conspiracy. I shall address these issues shortly.

A primary "target" of the F.B.I. in this investigation was Ms. Linda Whitman, a

onetime client of Mr. Smith's. Various incriminating phone calls and conversations were recorded between Mr. Smith, Linda Whitman and defendant James Harnage.[3] After marshalling such tape recorded conversations, Special Agent Charles Evans stopped by Whitman's house and confronted her with the incriminating evidence. In an attempt to pierce this suspected conspiracy, she was persuaded to become an informant for the F.B.I. She began taping her conversations with members of the cocaine distribution group which included defendants.

The government plans to use no evidence of conversations between Mr. Smith and any of his "clients." All evidence to be used consists of the conversations between Whitman and the various defendants. Whitman has been granted immunity. Similarly, James Harnage has been dismissed from this case. Apparently his one hundred year sentence is considered sufficient to reach a practical result if not the ends of ideal justice.

### 1. Sahli's Motion to Dismiss for Violation of the Attorney/Client Privilege.

Sahli argues that since Mr. James Smith simultaneously served as his attorney and as an agent provocateur for the F.B.I., the acts and disclosures of Smith violated Sahli's attorney-client privilege and Sahli's rights under the Fourth, Fifth, and Sixth Amendments.

### 2. Whitesel's Motion to Dismiss: Denial of Due Process (Outrageous Government Conduct).

Whitesel argues this attorney-client privilege "intrusion" also violates the due process clause of the Fifth Amendment. He states the government's use and direction of Smith as an undercover informant "set up" the defendants and violated all defendants' trust in lawyers by having Smith actively elicit incriminating statements.

### 3. Patey's Motion to Dismiss.

Patey's motion also attacks the government's "intrusion" into the attorney-client privilege.

It is conceded that no information or evidence obtained by Smith shall be used in this case as direct evidence. All information and evidence to be used is that of Linda Whitman's work as a paid informant. Defendants assert this is of no consequence. I shall address this point soon enough but it must be kept clear that we are not talking about the use of any of Smith's statements or recorded conversations with defendants.

To supplement the general allegations and arguments presented in these preliminary motions, defendants have filed a combined brief to support their several motions to dismiss for governmental misconduct and abuse of the attorney-client privilege.

Defendants argue Smith was the retained attorney of Whitman and Harnage while he was being "strong-armed" by the government to be a paid informant and betray his clients. Defendants charge the use of an attorney who was addicted to drugs and under threat of indictment to tunnel into an organization whose members made statements to him relying on the attorney-client privilege is a most repugnant form of police investigation. For this reason, according to defendants, the indictment should be dismissed.

The fact that Harnage and Whitman themselves are not now defendants does not matter according to defendants. The only reason Whitman and Harnage agreed to become informants in the first place was because their attorney-client trust was breached by Smith. Thus, according to defendants, Harnage and Whitman, especially Whitman since she was given immunity for her work as an informant, had no choice but to agree to become informants. In other words, Whitman's recordings of phone calls and conversations with defendants are "tainted", so to speak, by the original breach of Whitman's attorney-client trust in Smith.

---

**3.** James Harnage was the alleged leader of this conspiracy. He has been dismissed from this indictment and is serving a 100–year federal prison term.

Defendants cite *United States v. Valencia*, 541 F.2d 618 (6th Cir.1976) for the proposition that an indictment should be dismissed on the basis of outrageous governmental intrusion into the attorney-client relationship even though an attorney may be directly involved in the criminal conspiracy. In *Valencia*, the attorney's secretary was a paid government informant who was present when the attorney made drug transactions. She related this information to the government and even gave the government the client/defendants' files. The court in *Valencia* held that it was improper for the government to have intruded into an attorney-client relationship by paying an attorney's secretary for information about the attorney's clients.

There is an important distinguishing point, however, about *Valencia*. Namely, the secretary in *Valencia* revealed confidential attorney-client information to the government relating to the attorney's client *after* the client had been arrested. Further, the evidence to be used in the instant case is not direct evidence of Smith's contacts with any of his clients. Rather, the direct evidence is derived from Whitman's contact with defendants which, is one step removed.

In the companion case to the instant case, *United States v. Fortna*, 796 F.2d 724 (5th Cir.) *cert. denied*, ── U.S. ──, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986) the Fifth Circuit readily distinguishes *Valencia* from the circumstances present in the instant case. In *Fortna, supra*, the defendant/appellants attempted to suppress evidence garnered by Harnage who, like Whitman, agreed to become an informant. The Fifth Circuit made the following determinations:

> The informant in *Valencia* provided the government with information about persons under investigation for a crime that had already occurred. This tainted evidence may have been the basis for the *Valencia* defendants convictions. *Any evidence derived here from a breach of Harnage's relationship with Smith was used not to convict appellants, but to permit the government to recruit an undercover informant who provided information about crimes that occurred after the claimed breach of the attorney-client privilege and that was not directly related to the events for which Harnage claims to have sought legal advice.* The connection between the evidence against these other appellants and the potential intrusion into the Harnage-Smith [Whitman-Smith] attorney-client relationship is too attenuated to support suppression of the evidence. We also note that unlike the situation in *Valencia*, Harnage's Sixth Amendment rights are not clearly implicated because the alleged violation of the attorney-client privilege occurred before the initiation of adversary proceedings in this case. In general, the government's conduct here, even if assumed to be an intrusion into the privileged relationship, was not as egregious as that in *Valencia*. (emphasis added).

*Fortna* at 733.

Further, Smith did not supply, nor was he asked to supply, attorney-client information. "I never discussed cases ... I remember discussing buying drugs and using drugs with people and socializing with people." (Smith Transcript Vol. I pp. 78–79). In June 1984, he essentially closed his law practice. (Smith Trans. Vol. I pp. 73–77, 91). On June 13, 1984, he sent a letter to former client Linda Whitman telling her that he would not be able to represent her in the future. (Smith Trans. Vol. I pp. 67–68; Vol. II p. 17). *In passim* I note that Smith asserted in his testimony that he owed no duty to a former client. Such a callous view suggests why Smith got into difficulty in the first place.

 It is clear to me from the testimony and the nature of these relationships that the attorney-client privilege has not been violated by the government's investigative techniques. That Smith was an attorney of dubious ethicality does not mean every conversation he had was bestowed with the privilege of confidentiality. Not every conceivable conversation with someone claiming to be a "client" is protected

from disclosure. As stated in *In re Oster-houdt*, 722 F.2d 591 (9th Cir.1983):

> [T]he authorities are clear that the privilege extends essentially only to the substance of matters communicated to an attorney in professional confidence. Thus the identity of a client, or the fact that a given individual has become a client are matters which an attorney normally may not refuse to disclose, even though the fact of having retained counsel may be used as evidence against the client.

*Id.* at 594.

■ What should be even more obvious is that criminal conversations are not covered by the privilege. Most appropriate to this determination is the criminal conspiracy exception to Rule 501, Fed.R.Evid. As the Ninth Circuit states in *United States v. Hodge and Zweig*, 548 F.2d 1347, 1354 (9th Cir.1977):

> Because the attorney-client privilege is not to be used as a cloak for illegal or fraudulent behavior, it is well-established that the privilege does not apply where legal representation was secured in furtherance of intended, or present, continuing illegality. [citations omitted]. The crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of such an improper purpose.

■ An offer to provide an attorney's services as a "fringe benefit" to members of an ongoing criminal enterprise does not establish an attorney-client relationship that the courts will recognize. *Id.*

In the instant case, no defendant has established that an attorney-client relationship existed between any defendant and Smith. This is extremely significant, since the attorney-client privilege is a right of the client and of no other person. Because no defendant had an attorney-client relationship directly with Smith at the time of the recordations, they have no standing to assert any attorney-client privilege for themselves. Moreover, no defendant has established that an attorney-client relationship that existed, *arguendo*, between Smith and anyone else was ever intentionally violated. Smith related the drug activities he witnessed and/or heard about concerning former clients. Linda Whitman was one such client, whom the government pursuaded to become an informant.

Furthermore, an attorney, solely by reason thereof, cannot ignore the rights and obligations imposed on members of the Bar. DR4–101(C)(3) of the Code of Professional Responsibility provides that a lawyer may reveal the "intention of his client to commit a crime and the information necessary to prevent the crime." I do not suggest or imply that Smith was ever motivated by this precept. DR5–107(B) recognizes that a person who pays for an attorney's services for another does not thereby establish a personal attorney-client relationship. Smith may have been aware of this precept. I suggest this possibility since it would serve to relieve him of responsibility whereas the former would add to the professional burden.

Finally, in the companion case of *United States v. Fortna, supra,* at 732, the court held: (1) no privilege would be recognized if "legal representation was secured in furtherance of intended, or present, continuing illegality", and (2) no possible right of one the defendants of the conspiracy can be asserted vicariously by his co-conspirators.

Accordingly, the motions to dismiss are denied. The privilege is inapplicable where an attorney is consulted in furtherance of a crime. *In re Grand Jury Proceedings (Vargas),* 723 F.2d 1461, 1467 (10th Cir. 1983) *cert. denied,* 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984). In any event, Smith did not testify before the grand jury and will not be called at trial. The government's case is based solely upon the activities of defendants to which immunized co-conspirator Linda Whitman will testify.

### 4. *Other Alleged Governmental Misconduct.*

The other alleged misconduct in this case involves: (1) Agent Evans' "search" of Sahli's house; (2) his cautionary advice to defendant Whitesel on the selection of an attorney; and (3) his questioning of Paula Kelly without her attorney being present.

■ First, no evidence was obtained during Agent Evans' "search", or walk-through, of Sahli's house, thus, there is no evidence to suppress. Defendants are upset, however, that Agent Evans walked through ("searched") the house without a warrant. Sahli's house apparently was for sale. Agent Evans *obtained permission* to walk through the house because the real estate agent who gave Agent Evans permission to walk through had Sahli's permission to open his home to outsiders. Thus, even if the government obtained evidence from the house and sought to use it, I assume it would be admissible under three separate theories. If, while walking through the house he spotted some contraband and seized it, then under the "plain view" doctrine, *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), such evidence would be admissible since it was not unconstitutional for Agent Evans physically to be in the house in the first instance. Secondly, Sahli had no "legitimate and reasonable expectation of privacy" pursuant to *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), given the fact that he held his home open to the public in such a fashion. Finally, under the doctrine of third-party consent, *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), any evidence found during the walk-through would not be evidence unconstitutionally obtained because Evans had the real estate agent's consent to be in the house and "look it over." This would not be true, however, if Agent Evans were to go beyond his purposes for being in the house. Thus, his "search"/walk through of the house most likely would not even be enough to suppress evidence actually seized, much less enough to constitute "governmental misconduct" warranting dismissal of this indictment.

■ Second, the circumstances surrounding Agent Evans' advice to Whitesel concerning a potential conflict of interest if Whitesel chose a certain attorney, cannot reasonably be construed as a threat to, or interference with, Whitesel's right to choose counsel. There was, arguably, a potential conflict of interest issue concerning Whitesel's choice of Arthur Schwartz as his counsel had Jean Brown (a former potential defendant in this case and client of Schwartz') been indicted. Agent Evans merely let defendant know of this potential conflict of interest.

■ Third, the fact that Agent Evans spoke with Paula Kelly (a potential witness in this case) without her attorney present does not implicate any rights of defendants. This was simply a witness interview; Paula Kelly is not a defendant. Accordingly, Agent Evans' conduct was not improper. Thus, defendants' motions to dismiss for governmental misconduct are denied.

## C. MOTIONS TO SUPPRESS

### 1. *Patey's Motion to Exclude Evidence Pursuant to Fed.R.Evid. 403.*

Patey contends the government intends to introduce evidence consisting of a law enforcement contact in Boston which resulted in a "civil negotiated settlement" as a consequence of an "offer of compromise" and remote incidental events occurring in Dallas, Texas, Albuquerque, New Mexico, Tampa, Florida, and Aurora, Colorado.

This evidence, which will accumulate as the proceedings in this case continue, is admittedly probative under Fed.R.Evid. 401. However, Patey claims its probative value is substantially outweighed by the danger of unfair prejudice, and thus should be excluded under Rule 403, Fed.R.Evid.

Patey cites no case authority in his motion.

In response, the government states the evidence is admissible to prove existence of a conspiracy. *See United States v. Andrews*, 585 F.2d 961, 964 (10th Cir.1978); and, *United States v. Barker*, 623 F.Supp. 823, 832 (D.Colo.1985). Neither of these cases, however, is particularly apropos, since they both address the admissibility of co-conspirator statements under the hearsay rule.

Patey's motion is premature. The evidence to which he alludes is barely explained. I cannot perform the balancing test mandated by Rule 403 without specific

knowledge of the evidence to which the defendant objects. The motion is denied, *without prejudice* in order to renew at trial once the evidentiary outlines have become more distinct.

2. *Patey's Motion to Suppress Property.*

Patey also moves, under Fed.R.Crim.P. 12(b)(3) and 41(f), to suppress all property confiscated from him at Boston's Logan Airport. Patey contends he was subjected to an illegal and warrantless search and seizure of his person and personal baggage.

The government contends the x-ray analysis of Patey's baggage disclosed numerous unknown packages in his luggage. Officers then asked Patey if they could search his baggage and he agreed. The packages turned out to contain $65,000 in cash and suspected marijuana. Citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the government argues the totality of the circumstances prove Patey voluntarily consented to the search.

Trooper Lynch, the Massachussetts law enforcement official who searched Patey's bag and eventually arrested Patey, testified concerning the voluntariness and surrounding circumstances of Patey's consent to have his bag searched. Trooper Lynch also testified to the whole general incident surrounding the initial search, questioning, and eventual arrest of Patey. (1/16/87 Hearing Trans.).

Patey argues his "consent" was involuntary and that although Trooper Lynch may have had initial justification to search his bag (the x-ray scan at the airport revealed opaque unidentifiable objects in the bag), the continued "interrogation" was unjustified after Lynch discovered the "opaque unidentifiable objects" on the x-ray scanning screen were merely plastic bags containing American currency and not the suspected dangerous explosives or weapons

the x-ray scan search was designed to detect.

Defendant actually raises two issues which logically must be kept separate: (1) was there an *actual* consent, not a mere verbal coerced consent to the search; and, (2) was the search a valid, legal search from its inception to its completion.

With respect to consent, there is no question that Patey verbally assented to whether Lynch could search the bag. (1/16/87 Hearing Trans. pp. 7–8). The appropriate question, then, is whether the surrounding totality of the circumstances made Patey's consent to the search *voluntary,* and not involuntary because of duress or coercion, express or implied. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct 1870, 1878, 64 L.Ed.2d 497 (1980); *Schneckleth v. Bustamonte, supra,* at 227, 93 S.Ct. at 2047.

To establish the validity of the defendant's consent to the search of his bag, the government must show the following:

(1) There must be clear and positive testimony that consent was "unequivocable and specific" and "freely and intelligently" given; (2) the government must prove the consent was given without duress or coercion, express or implied; and (3) the courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived.

*United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir.1986).

 The evidence is undisputed that Patey consented to the search of his bag by first placing it on the x-ray machine belt, and, second, by expressly stating to Lynch that he (Patey) "didn't mind if he [Lynch] searched the bag." Patey never objected to the search and no threat, promise, or coercion was used to obtain his consent.

Based on Patey's answers to Lynch's questions concerning the money [4], and

4. The following is an example of the answers Patey gave to Lynch concerning the money (Lynch's testimony, 1/16/86 Hearing Trans. pp. 8–10):

A [After Patey stated there was only $5,000 in the bag and the initial search revealed more bundles of cash] ... I asked him [Patey] approximately how much money he felt was in the

based upon Lynch's belief the attendant circumstances indicated the money was contraband, Trooper Lynch had cause to seize the money absent some indication as to its lawful possession by Patey. At that point, Patey was specifically told that he was not under arrest and was free to leave. Patey elected to follow Trooper Lynch to his office where a more thorough search of his bag disclosed the marihuana thus establishing probable cause for Patey's arrest.[5]

Notwithstanding my factual and legal determinations concerning Patey's voluntary consent made from the evidence adduced at the hearings, I am puzzled by the government's failure to invoke cases which justify searches of carry-on luggage as part of the precautions taken against hijacking, thus removing the need to establish voluntary consent. For example, in *United States v. Clay*, 638 F.2d 889 (5th Cir.) *cert. denied*, 451 U.S. 917, 101 S.Ct. 1996, 68 L.Ed.2d 310 (1981), the defendant placed her shoulder bag on the x-ray scan machine at the security gate. The officer monitoring the screen noticed a large dark object inside the bag. The officer obtained Clay's permission to search the bag. He discovered a 10 by 13 inch manila envelope, which he opened. Inside this envelope was another manila envelope, which also was opened. The second envelope housed a package wrapped in dark plastic. The officer unwrapped the dark plastic and discovered a clear plastic package containing a white powder. This powder turned out to be cocaine. *Id.* at 891.

The government in *Clay* posed the consent theory only as an *alternative* to the legitimacy of the security officer's search. The court did not rule pursuant to the consent theory. Instead, the court accepted the government's primary theory that since "the x-ray scan machine indicated Clay's shoulder bag contained an unidentifiable dark object," sufficient suspicion existed on which to base "a complete physical

---

bag. At that point he said, "I guess it's closer to $10,000."

I continued to remove items from the bag, and I continued to encounter more plastic bags with money and money wrapped in plastic, and I asked him for a third time how much was in there and at that time he stated to me there was $65,000 cash in the bag.

Q Did he give you any explanation as to where this money came from?

A Well, I asked him if the money belonged to him, and he stated that it did. I asked him if he had been—where he had obtained the money. *He stated to me that it was tips that he had been saving from his job as a waiter.* I asked him if he had been keeping it in a bank and if he had any bank receipts or a book showing a recent withdrawal of that amount of money, and he stated, "no" that he had been storing the money in coffee cans in his backyard. (emphasis added).

Q Did you ask him to see a ticket of any sort as to traveling?

A Yes. Mr. Patey was in possession of a one-way ticket ... [I]t was from passage to Boston from Miami.

. . . . . .

Q [Why did he come to Boston?]

A He was in Boston for the purpose of looking at a sailboat—or a boat ... He couldn't remember the name of the dealer who had the boat for sale, and he couldn't remember the exact location, the pier, or the wharf where the boat was, or any of the specifics about the boat.

**5.** On cross-examination, Patey's counsel attempted to establish Patey was "seized" in the airport because Lynch seized the money. *See* 1/16/87 Hearing Trans. pp. 20–21. Such a semantical construction is not recognized by established law:

Q And when you say that Mr. Patey was not under arrest, was he free to leave at any time he wanted to?

A Yes, sir.

Q He could have just walked away, right?

A Yes, sir.

Q Could he have walked away with his bag and his money?

A No.

Q Oh, so he was sort of being held hostage, in a fashion, for the $65,000, or whatever U.S. currency you had discovered at the one point in time; is that correct?

A No, I wouldn't say he was being held hostage. He was free to go at any time, and I explained that to him.

Q But you weren't even going to give him a receipt unless he accompanied you back to the barracks, were you?

A I didn't have the receipt to give him there, and I wasn't going to start counting his money in front of a busy airline terminal.

Q So he would have been able to leave, according to your testimony, if he left without his bag, without his money, and without a receipt from you; is that correct?

A He could have come back at any time he wanted to the barracks and gotten a receipt. He could have left there and come back two days later and picked up the receipt.

search of the luggage until the object was positively identified as harmless." *Id.* at 892.

In the instant case, the object found, U.S. currency, was positively identified as harmless. The currency itself, however, coupled with Patey's incredulous answers regarding the currency and his one way ticket to Boston, Massachussetts from the "source city" of Miami, Florida, raised *independent and separate reasons* for: (1) further questioning; (2) the eventual seizure of the money-contraband; and, (3) the ultimate search of the bag resulting in Patey's arrest for marihuana possession.

*United States v. Smith*, 643 F.2d 942 (2nd Cir.1981), *cert. denied*, 454 U.S. 875, 102 S.Ct. 350, 70 L.Ed.2d 182 (1981) is similar. There, DEA agents trailing Smith alerted the airline security personnel of the ongoing investigation and requested an identification of Smith if she appeared at the security checkpoint. The description of Smith included a proviso that she might be carrying large quantities of cash. The DEA noted "that it would be helpful if security personnel could obtain serial numbers from the bills." *Id.* at 943.

Smith did appear at the checkpoint. The x-ray machine revealed a large, unidentified mass at the bottom of her shoulder bag. The employee who searched the bag testified that it was shaped like a "plastic explosive." Smith was told the bag would have to be searched if she wanted to board the plane, and she nodded affirmatively. Looking into the bag, the employee perceived a large stack of bills at the bottom. Smith was then turned over to local police officers standing nearby.

The Second Circuit held the initial screening of the bag to be constitutional. The intrusion posed by x-ray screening of all passengers is reasonable when balanced against the dangers posed by hijackers. *Id.* at 944; *accord United States v. Henry*, 615 F.2d 1223, 1228 (9th Cir.1980). The *Smith* court next held the employee's search of the bag to be permissible, since a determination had to be made of the dangerousness posed by the unidentified mass. *Id.* at 944–945. *From that point*, the po-

lice had probable cause to remove the money from the bag and check the serial numbers. *Id.* at 944.

The *Smith* court noted the obvious concern over the DEA's use of procedures designed to curb hijacking as a means of enforcing drug laws. *Id.* at 944. Nevertheless, because the employee monitoring the screen had an *independent and adequate basis* for looking into the bag, Smith's constitutional rights had not been violated. *Id.* The court was impressed by the fact that the security employee's search had not exceeded its permissible scope; namely a determination of whether the bag contained a weapon or explosive.

The government here could invoke *Clay* and *Smith* to justify the search of Patey's carry-on baggage. The x-ray machine disclosed the presence of several unidentified packages in the baggage. Since these packages were large enough to house a weapon or explosive, the security officer was justified in opening them to determine the presence of any actual weapon or explosive. Thus, consent to the search would appear to be unnecessary, as long as Patey was aware of his right not to board the aircraft or to board it without the offensive baggage. *Henry*, 615 F.2d at 1230–31.

■■■ Anticipating this argument, Patey contends he was not aware of his right to leave. This, however, was not supported by the evidence adduced at the hearings. I have found already that there was a full waiver and consent to the search and for that reason alone the search is valid and no evidence shall be suppressed. Notwithstanding that determination and assuming for a moment that there was no consent, the search still would be valid given these circumstances and the validity of the x-ray scanning search.

The motion is therefore denied.

### 3. *Patey's Motion to Suppress Statements.*

■■ Patey moves to suppress the statements he made, and any conduct which could be construed as a statement, at Logan Airport. He claims the statements

were the result of an illegal arrest or unlawful search and seizure; were involuntary; were made prior to any waiver of his Fifth and Sixth Amendment rights; and/or were the result of entrapment or overreaching by law enforcement officers or those operating at their direction. He also seeks a hearing on the issue of voluntariness pursuant to 18 U.S.C. § 3501, which covers the admissibility of confessions.

In response, the government contends the statements were the product of a noncustodial interview, citing *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). That case is not factually controlling. I have already determined, however, that the initial search, subsequent seizure, and the ultimate arrest were all lawful and not tainted by any constitutional violation. Also, Patey's consent was lawful and voluntary, not coerced. Further, the statements he made were in a non-custodial setting. Trooper Lynch informed Patey that he was not under arrest, did not have to accompany Trooper Lynch to the barracks, and was free to leave. (1/16/87 Hearing Trans. pp. 20–21). At the January 16, 1987 hearing, Trooper Lynch testified as follows:

> I stated to him [Patey] more than once that he was not under arrest, he did not have to come with me, he could take—he could have gone and taken his flight, if he wished. I stated that the money was coming with me back to the police barracks at Logan Airport, at which time I would completely count it in his presence and issue him a signed receipt for that money and also have it—explain to him how to—if this money was in fact his, how he could legally go about reobtaining it.

(1/16/87 Hearing Trans. pp. 10–11).

Patey certainly was not "held hostage". His money, if it were indeed his money, was merely seized. In any event, Patey himself was not seized nor coerced into making admissions while in a custodial setting. The motion is denied.

4. *Sahli's Motion to Suppress Statements.*

 Sahli moves to suppress recorded statements he made to Linda Whitman.

He first argues the tapes themselves are nothing more than "idle chatter between friends." There is no merit to this argument. Since it is the province of the jury to determine the significance of any conversations between Sahli and Whitman, Sahli's argument goes only to the weight of the evidence, not to its admissibility.

Sahli next claims the tapes are a form of "guise and deception." If Whitman had identified herself as a government agent, then Sahli would have been advised of his rights. The government, Sahli argues, cannot eschew these requirements by guise and deception. He cites *Fraternal Order of the Eagles, No. 778 v. United States*, 57 F.2d 93 (3rd Cir.1932). That case is simply inapposite.

 In its response, the government claims Sahli's statements are all preindictment, noncustodial statements made to a co-conspirator. Under *Hoffa v. U.S.*, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it," even if the confidant is a paid secret government informant. Moreover, it is axiomatic that the Fifth Amendment protects only compelled self-incrimination. Sahli does not allege his statements to Whitman were not voluntary. His motion is denied.

5. *Whitesel's Motion to Suppress Statements.*

Whitesel is in the same predicament as Sahli regarding taped conversations with Whitman. Whitesel, however, alleges his participation in these conversations occurred only because Whitman threatened him and his family. Therefore, he contends his statements are involuntary.

The government contends "[a]t no time were threats made springing from any relationship between Whitman and the government." The government appears to be informing me that if Whitman did threaten Whitesel, she did not do so at the instruction, encouragement, or acqui-

escence of law enforcement officers. Her threats, if any, constitute private rather than state action. *See United States v. Lamport,* 787 F.2d 474, 476 (10th Cir.) *cert. denied,* —— U.S. ——, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986).

 Whitesel testified at the January 20, 1987 hearing that Linda Whitman in effect coerced and intimidated him into making inculpatory statements that were recorded by Whitman, pursuant to the government's request. He admitted that although she was very friendly during the meetings that were recorded, prior subtle threats made by Whitman for payment of drug proceeds, Whitesel owed to her and Harnage, rendered the recorded statements involuntary. (1/20/87 Hearing Trans. pp. 7–12, 24–29). The government submits that the tape recordered conversations are the most probative evidence of voluntariness. I have nothing to go on but Whitesel's conclusory testimony that Whitman threatened him at the government's direction. The factual predicate for the conclusion is missing. I find his testimony incredible; I find his statements to have been voluntary. Additionally:

> [C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.

*Colorado v. Connelly,* —— U.S. ——, 107 S.Ct. 515, 93 L.Ed.2d 473, 484 (1986).

 The government concedes the drug business can be dangerous and threatening. However, Whitesel freely chose to traffic drugs and should not now have a defense of "someone at sometime" made threats. There has been no showing of *specific* threats having been made to exact *these particular statements* defendant is now attempting to suppress. The recorded statements introduced at the hearing and the testimony established, by a preponderance, that Whitesel's statements to Whitman were voluntary. Whitesel's misplaced belief that Whitman would not reveal or record his volunteered and incriminating statements is not protected by the Fourth Amendment. *Hoffa v. United*

*States,* 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *United States v. Anderson,* 778 F.2d 602, 604 (10th Cir. 1985).

Defendant cites no case authority to support his position. All of the cases cited by the defendant were cases involving custodial police interrogation which are factually inapposite to defendant's own testimony. If defendant wishes to argue his recorded statements were coerced and made under threats by Whitman, and are thus not credible, he may make this argument to a jury. It is an argument which goes to the weight of the evidence in question, however, not to its admissibility. The motion is therefore denied.

## D. MISCELLANEOUS MOTIONS

1. *Sahli's Motion Concerning Order of Proof at Trial.*

Sahli requests the government prove any substantive act before putting on evidence of a conspiracy. The government states it will follow the preferred order of proof rule set forth in *United States v. Petersen,* 611 F.2d 1313, 1330 (10th Cir.1979), *supra.* The motion is denied as moot.

2. *Patey's Motion to File Rule 12.1 Notice Out of Time.*

Patey states the words "on or about" a certain date prevents defendant from ascertaining whether or not Rule 12.1 is pertinent. The government has no objection. The motion is denied as moot.

3. *Harkin's Motion Reserving Right to File Notice of Alibi.*

This is the same motion made by Patey above. Defendants wish to know more specifically the dates and times of the commission of the crimes, in order to ascertain whether they have evidence of an alibi. The government has no objection. The motion is denied as moot.

IT IS THEREFORE ORDERED THAT:

1. All pending motions are denied in accordance with this opinion or are moot.